No. 15-2230
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

SIG SAUER, INC.,

Plaintiff-Appellant

v.

THOMAS E. BRANDON,
Deputy Director,
Bureau of Alcohol, Tobacco, Firearms and Explosives,

Defendant-Appellee

_____

Appeal from the U.S. District Court for the
District of New Hampshire, Civil No. 1:14-cv-00147-PB

_____

**BRIEF FOR APPELLANT SIG SAUER, INC.**

_____

Stephen P. Halbrook
Suite 403
3925 Chain Bridge Road
Fairfax, VA 22030
(703) 352-7276
protell@aol.com

Mark C. Rouvalis
Kenton J. Villano
City Hall Plaza
900 Elm Street
Manchester, N.H. 03101
(603) 628-1329
mark.rouvalis@mclane.com
Kenton.villano@mclane.com

Counsel for Appellant

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Appellant Sig Sauer, Inc., is owned by Sig Sauer US Holding LP, which in turn is owned by L&O Finance GmbH. L&O Finance GmbH is thus identified as the parent corporation of Sig Sauer, Inc. No publicly held corporation owns 10% or more of the stock of Sig Sauer, Inc.

/s/ Stephen P. Halbrook
Stephen P. Halbrook

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .........................................i

TABLE OF AUTHORITIES ............................................... iii

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ..........................ix

STATEMENT OF SUBJECT MATTER AND APPELLATE
JURISDICTION ............................................................1

STATEMENT OF ISSUES ..................................................1

STATEMENT OF THE CASE ...............................................2

Proceedings in the Court Below ........................................2

Statement of Facts ....................................................3

SUMMARY OF ARGUMENT ............................................14

ARGUMENT ..........................................................18

Standard of Review ..................................................18

Introduction .........................................................19

I. THE STATUTORY TEXT AND LEGISLATIVE PURPOSE CLARIFY
  THAT A MUZZLE BRAKE IS NOT A "PART INTENDED ONLY
  FOR USE" IN ASSEMBLY OR FABRICATION OF A SILENCER ...............20

A. In the Statutory Text, "Intended Only for Use" Precludes Dual Purposes ........20

B. The Statutory, Administrative, and Judicial Background Show
   that Use of a Muzzle Brake to Decrease Recoil and to Increase
   Barrel Length Precludes the Intent to Use as a Silencer ....................23

II.  THE PLAIN TEXT AS APPLIED IN *UNITED STATES v. CROOKER*
     (1st Cir. 2010) VERIFIES THAT "INTENDED ONLY FOR USE"
     PRECLUDES A STANDARD OF CAPABILITY FOR ADAPTATION
     WITH THE ADDITION OF OTHER PARTS ...................................................27

  A.  Under *Crooker* and Related Decisions, Specific
      Intent to Use an Item as a Silencer is Required ..................................27

  B.  ATF's Silencer Classification Held to Be Arbitrary
      and Capricious in *Innovator Enterprises* .............................................34

III.  THE MEANING OF "INTENDED ONLY FOR USE" IS CLEAR,
      THE ISSUE ARISES UNDER A CRIMINAL STATUTE, AND NO
      DEFERENCE TO AGENCY OPINION IS DUE ...........................................37

  A.  The Definition of Silencer is in a Criminal Statute, and Its
      Meaning is the Same in a Civil Case as in a Criminal Case ..............37

  B.  The Meaning of "Intended Only for Use" is Clear,
      and ATF is Not Otherwise Entitled to Deference ................................42

  C.  The District Court Erred in Excusing ATF's Disregard of Sig
      Sauer's Intent to Market a Rifle with the Barrel/Muzzle Brake
      Length of 16 Inches in Order to Avoid Legal Restrictions ................46

CONCLUSION ...........................................................................................55

CERTIFICATE PURSUANT TO F.R.A.P. 32(a)(7)(B) .........................57

ADDENDUM ..............................................................................................58

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page**

*Abramski v. United States*, 134 S. Ct. 2259 (2014) .................................................42

*Boivin v. Black*, 225 F.3d 36 (1st Cir. 2000) ........................................................21

*Brown v. O'Brien*, 666 F.3d 818 (1st Cir. 2012) ....................................................37

*Carter v. Welles-Bowen Realty, Inc*., 736 F.3d 722 (6th Cir. 2013) .......................38

*Chevron USA v. Natural Resources Defense Council, Inc*.,

  467 U.S. 837 (1984)..........................................................................................42-45

*Christensen v. Harris County*, 529 U.S. 576 (2000) ..............................................44

*City of Arlington, Texas v. FCC*, 133 S. Ct. 1863 (2013) ......................................43

*Clark v. Martinez*, 543 U.S. 371 (2005) .................................................................38

*Crandon v. United States*, 494 U.S. 152 (1990) .............................................38, 40

*Davis v. Erdmann*, 607 F.2d 917 (10th Cir. 1979) ................................................44

*F. J. Vollmer Co., Inc. v. Higgins*, 23 F.3d 448 (D.C. Cir. 1994) ................... 45-46

*F. J. Vollmer Co., Inc. v. Magaw*, 102 F.3d 591 (D.C. Cir. 1996) .......................46

*Farrell v. Commissioner of Internal Revenue*, 136 F.3d 889 (2nd Cir. 1998) ........21

*FCC v. American Broadcasting Co*., 347 U.S. 284 (1954) ....................................41

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ............................................................38

*Innovator Enterprises, Inc. v. Jones*, 28 F. Supp.3d 14 (D. D.C. 2014) ..... 34-36, 48

iv

*Leocal v. Ashcroft*, 543 U.S. 1 (2004) ....................................................38

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989) ........................52

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

  463 U.S. 29 (1983)....................................................................................44

*Perry v. Roy*, 782 F.3d 73 (1st Cir. 2015) ...............................................19

*Santana v. Holder*, 731 F.3d 50 (1st Cir. 2013) ......................................42

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)..........................................41

*Tripoli Rocketry Association, Inc. v. BATFE*, 437 F.3d 75 (D.C. Cir. 2006) .........44

*United States v. Apel*, 134 S. Ct. 1144 (2014) ..........................................38

*United States v. Carter*, 465 F.3d 658 (6th Cir. 2006),

  *cert. denied*, 550 U.S. 964 (2007) ...........................................................33

*United States v. Carter*, 752 F.3d 8 (1st Cir. 2014)..................................19

*United States v. Crooker*, 608 F.3d 94 (1st Cir. 2010) ....................*passim*

*United States v. Hurd*, 642 F.2d 1179 (9th Cir. 1981) .............................25

*United States v. Klebig*, 600 F.3d 700 (7th Cir. 2010) .............................33

*United States v. Lanier*, 520 U.S. 259 (1997) ..........................................30

*United States v. Marshall*, 753 F.3d 341 (1st Cir. 2014)..........................26

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ...................................45

*United States v. Ritsema*, 31 F.3d 559 (7th Cir.1994) ..............................47

v

*United States v. Rose*, 522 F.3d 710 (6th Cir. 2008) ...............................................34

*United States v. Santos*, 553 U.S. 507 (2008)..........................................................38

*United States v. Schrum*, 346 F. Supp. 537 (E.D. Va. 1972)....................................25

*United States v. Syverson*, 90 F.3d 227 (7th Cir. 1996),

 *cert. denied*, 519 U.S. 982 (1996) ........................................................................32

*United States v. Taylor*, 100 Fed. Appx. 305 (5th Cir. 2004)..................................33

*United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992) ................ 38-41

*Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427 (2014) ...............................43

*Vais Arms, Inc. v. Vais*, 383 F.3d 287 (5th Cir. 2004)..............................................19

## STATUTES

5 U.S.C. § 706(2)(A).............................................................................................19, 48

18 U.S.C. § 921 *et seq*............................................................................................3, 51

18 U.S.C. § 921(a)(3)...................................................................................................3

18 U.S.C. § 921(a)(8)...................................................................................................8

18 U.S.C. § 921(a)(24)..........................................................................................*passim*

18 U.S.C. § 922 ...........................................................................................................4

18 U.S.C. § 922(a)(4)...................................................................................................8

18 U.S.C. § 922(b)(4)...................................................................................................8

18 U.S.C. § 923 ...........................................................................................4

18 U.S.C. § 923(g)(1)(A) ...........................................................................4

18 U.S.C. § 923(i) .......................................................................................4

18 U.S.C. § 924(a) .....................................................................................37

26 U.S.C. § 5801 *et seq.*...........................................................................4

26 U.S.C. § 5811 ....................................................................................4, 8

26 U.S.C. § 5812 ....................................................................................4, 8

26 U.S.C. § 5841 ...............................................................................4, 8, 51

26 U.S.C. § 5845(a)(3)....................................................................8, 39, 51

26 U.S.C. § 5845(a)(7).................................................................................4

26 U.S.C. § 5845(b) ..................................................................................30

26 U.S.C. § 5845(c) ..................................................................................39

26 U.S.C. § 5861 .......................................................................................37

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 1331 .........................................................................................1

Firearms Owners' Protection Act, P.L. 99-308, 100 Stat. 449 (1986)..20, 23-25, 27

Gun Control Act, P.L. 90-618, 82 Stat. 1213 (1968)........................27, 51

National Firearms Act, P.L. 474, 48 Stat. 1236 (1934) ..........................23

**REGULATIONS**

27 C.F.R. § 179.11 (1985) .........................................................................24

27 C.F.R. § 478.92(a)(1) ......................................................................4, 23

27 C.F.R. § 479.102 .................................................................................23

27 C.F.R. § 479.103 .................................................................................14

**OTHER AUTHORITIES**

ATF, *National Firearms Act Handbook*, ATF E-Pub. 5320.8 (2009)...........4, 23, 24

ATF Ruling 2005-4....................................................................................28

Paul A. Clark, "Criminal Use of Firearm Silencers,"

   *Western Criminology Review* 8(2) (2007) ............................................48

132 Cong. Rec., 99th Cong., 2d Sess. (1986) ................................... 25-26

*NRA Firearms Sourcebook* (2006)............................................................9

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Pursuant to 1st Cir. R. 34.0(a), Appellant states that oral argument would assist the court.  This case involves whether a device that reduces recoil, but increases noise, in a rifle that Appellant wishes to manufacture is a "part intended *only* for use" in assembling a silencer as defined in 18 U.S.C. § 921(a)(24), and whether the agency's position conflicts with *United States v. Crooker*, 608 F.3d 94 (1st Cir. 2010).  The case raises the jurisprudential issue of whether an agency is entitled to deference in a civil case regarding the meaning of a criminal statute.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 as the matter in controversy arose under the laws of the United States. The complaint sought a ruling that a certain muzzle brake on a rifle does not constitute a "firearm silencer" as defined in 18 U.S.C. § 921(a)(24). This Court has jurisdiction under 28 U.S.C. § 1291.

This appeal is from a final judgment entered on September 24, 2015, pursuant to the order of the same date granting defendant's motion for summary judgment and denying plaintiff's motion for summary judgment, thereby disposing of all parties' claims. Addendum ("Add.") 1, 2. A timely notice of appeal was filed on October 15, 2015. Appendix ("App.") 9.

## STATEMENT OF ISSUES

Sig Sauer, Inc., wishes to market a rifle with a muzzle brake that is intended to reduce recoil (kick) when it is fired, to extend its barrel to a 16 inch legal requirement, and to avoid unsafe pressures in the firing mechanism. A consumer would have the choice of using the rifle in that form or of adding other parts for other uses. By going through a legal procedure, a consumer would have the option of adding other parts to assemble a silencer.

1.  The issue is whether the muzzle brake is, despite having dual uses, a "part intended *only* for use" in the assembly or fabrication of a silencer, and thus is a "firearm silencer" as defined in 18 U.S.C. § 921(a)(24).

2.  A further issue is whether § 921(a)(24), which is a criminal statute, must mean the same in a civil case as it would in a criminal case, rendering the standards of intent set forth in this Court's decision in *United States v. Crooker*, 608 F.3d 94 (1st Cir. 2010), applicable here.

## STATEMENT OF THE CASE

### Proceedings in the Court Below

This was brought as an action for judicial review under the Administrative Procedure Act and for declaratory relief regarding an agency's decision that a device intended for use as a muzzle brake to reduce recoil in the discharge of a rifle and for other uses is, despite that intent, a "part intended only for use" in the assembly or fabrication of a firearm silencer, and is thus a "firearm silencer" in the meaning of 18 U.S.C. § 921(a)(24). See First Amended Complaint ("Compl."), App. 119.  Sig Sauer wishes to make and market a rifle with such muzzle brake. The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), of which Thomas E. Brandon is the Deputy Director, opined that the device is a firearm silencer, see Answer ("Ans."), App. 131, making it unmarketable.

After the complaint was filed, ATF sought, and Sig Sauer consented to, a remand to the agency for further consideration. App. 40. ATF then decided the issue adversely to Sig Sauer again. Add. 19. After further proceedings, the district court rendered summary judgment for ATF and denied Sig Sauer's motion for summary judgment. Add. 18. This appeal followed.

## Statement of Facts

*Statutory Background*. Plaintiff-Appellant Sig Sauer, Inc., is a federally-licensed manufacturer of firearms located in Newington, New Hampshire. Defendant-Appellee Thomas E. Brandon is the Deputy Director of the ATF, which administers and enforces the federal Gun Control Act ("GCA"), 18 U.S.C. § 921 *et seq*. The Firearms Technology Branch[1] is a component of ATF which Brandon supervises, directs, and oversees. Compl., App. 119-20; Ans., App. 131.

The GCA defines "firearm" in part as "(A) any weapon . . . which will . . . expel a projectile by the action of an explosive" and "(C) any firearm muffler or firearm silencer . . . ." § 921(a)(3). Section 921(a)(24) provides:

> The terms "firearm silencer" and "firearm muffler" mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or

---

[1]Recently redesignated as the Firearms and Ammunition Technology Division, it will continue to be referred to herein as the Firearms Technology Branch.

firearm muffler, and any part intended only for use in such assembly or fabrication.

The GCA imposes licensing requirements on persons who manufacture, import, and deal in firearms. 18 U.S.C. § 923. It imposes controls on the interstate movement and transfer of firearms. § 922. Manufacturers are required to mark firearms with a serial number, § 923(i), and to keep records of their acquisition and disposition of firearms. § 923(g)(1)(A). Silencers are regulated in the same manner as all other firearms under the GCA. Firearms must be conspicuously marked with the serial number and manufacturer information, 27 C.F.R. § 478.92(a)(1), which means that silencers are generally marked on the outer cover.

The National Firearms Act ("NFA"), 26 U.S.C. § 5801 *et seq*., regulates a more narrowly-defined subset of firearms. The NFA incorporates the GCA definition of "firearm" as including "any silencer (as defined in section 921 of title 18, United States Code) . . . ." 26 U.S.C. § 5845(a)(7). NFA firearms must be registered, § 5841, and transfer thereof requires an application with fingerprints and a photograph, payment of a $200 tax, and approval by ATF. §§ 5811, 5812.

A muzzle brake, which is a device at the muzzle end of the barrel that uses the emerging gas behind a projectile to reduce recoil or "kick" from firing a gun, is not encompassed in the above definitions of "firearm" or of "firearm silencer and

firearm muffler." The GCA and the NFA do not apply to muzzle brakes. Ans., App. 132.

The device at issue is intended to achieve Sig Sauer's three goals of making a rifle available with a 16" barrel, with a design that operates properly without high chamber pressures, and with an effective muzzle brake. Compl., App. 126. ATF "admits that the Plaintiff claims this is their intent." Ans., App. 136. ATF further admits that the device "reduces recoil and muzzle rise." Ans., App. 132, 136.

*Sig Sauer's Initial Submission*. By letter dated April 4, 2013, Sig Sauer submitted a rifle with the subject muzzle brake affixed to the barrel to the Firearms Technology Branch ("FTB"), requesting confirmation that it is a muzzle brake and not a silencer. App. 20. The letter explained that the device was 9.5" long and was permanently welded to a 6.5" barrel in order "to bring the barrel length to 16"." It advised that the device was threaded on the end to provide the customer with the option of attaching muzzle devices such as a flash hider, muzzle brake, or silencer. The letter stated: "The device is designed and intended to reduce the felt recoil of the firearm by directing the propellant gases perpendicular to the axis of the bore. It will not silence, muffle or diminish the report of the firearm." *Id*.

*FTB's Initial Response*. By letter dated August 26, 2013, FTB acknowledged receipt of "a rifle receiver with a device attached to its barrel,

5

manufactured and marketed by your company as a <u>muzzle brake</u> . . . .” App. 21. FTB called the device a “monolithic baffle stack” that “is a part intended only for use in the assembly or fabrication of a silencer and, therefore, is a silencer . . . .” App. 23.

*Sig Sauer Submits Further Information*.  By letter dated December 6, 2013, Sig Sauer submitted further information.  App. 26.  It documented its sound meter testing showing that “the muzzle device acts to amplify, rather than diminish, the report of a firearm.”  App. 26-27.  Further testing demonstrated that the device “is effective in reducing recoil and muzzle rise.”  App. 27-28.  It identified similar units with machined slots or ports that are marketed as muzzle brakes.  App. 28, 33-38.  *United States v. Crooker*, 608 F.3d 94 (1st Cir. 2010), was cited as recognizing intent requirements and dual uses of devices under which the device at issue would not be considered as “any part intended only for use in” making a silencer.  App. 29-30.

*FTB Reaffirms its Prior Decision*.  By letter dated February 21, 2014, FTB reaffirmed its opinion that the device “is a part intended only for use” in making a silencer without addressing Sig Sauer’s further documentation.   App. 39.

After the complaint was filed, ATF requested that the matter be remanded for further consideration and Sig Sauer consented.  The agreement was that ATF

would render a revised decision, Sig Sauer could submit additional information and documentation for reconsideration, and ATF would then respond to Sig Sauer. Parties' Joint Motion for Approval of Proposed Order to Stay Litigation Pending Reconsideration by the Defendant of Muzzle Device Classification, App. 40, 42-43. The district court so ordered.   Docket entry 6/9/2014, App. 4.

*On Remand, ATF Reaffirms its Prior Decision*.  In an undated letter from Earl Griffith, Chief, FTB, received by Sig Sauer on August 13, 2014 ("Letter"), ATF reaffirmed its prior decision.  App. 48, 63.  ATF stated that an item may be "objectively intended for use in reducing" sound."  App. 51.  It listed ten characteristics, including household items like washers and steel wool, it believed were found in conventional firearm silencers. *Id*.

ATF conceded that "a silencer may be produced from a conventional muzzle brake when other parts are added . . . ." App. 56.  ATF's sound-meter testing found that use of the Sig Sauer device "result[ed] in an increase of 2.41, 1.17, and 1.45 decibels to the side, front and rear of the firearm."  App. 62.  Regarding the device at issue, "ATF did not dispute the device's diminished recoil and muzzle rise." Ans., App. 136.

*Sig Sauer's Response*.  Sig Sauer responded to ATF in declarations dated September 18, 2014, by Steven Shawver, Vice President and General Counsel for

Sig Sauer ("SS Dec."), App. 111; and Ethan Lessard, a Design Engineer for Sig Sauer, who has a B.S. in Mechanical Engineering and experience in designing firearms, muzzle brakes, flash hiders, and silencers, ("EL Dec."), App. 97.  Also included were videos showing recoil testing and the functioning of the bolt when firing.  App. 100-102.

Sig Sauer designed the MPX rifle with a 6.5" barrel and a permanently-attached muzzle brake that extends the barrel by 9.5" for several reasons.  First, that gives the rifle a barrel of at least 16" in length, allowing it to be sold as an ordinary rifle not subject to special legal restrictions.  EL Dec., App. 97; SS Dec., App. 111.  Transfer of a rifle with a barrel under 16" in length requires ATF registration and approval and payment of a $200 transfer tax.  26 U.S.C. §§ 5811, 5812, 5841, § 5845(a)(3).  ATF approval is required for a dealer to sell such a rifle and for its owner to transport it in interstate or foreign commerce. 18 U.S.C. §§ 921(a)(8), 922(a)(4), (b)(4).  Most consumers wish to avoid the red tape, delay, expense, and waiver of privacy that are inherent in these restrictions.  SS Dec., App. 111.

Second, Sig Sauer chose to design the barrel by combining a 6.5" barrel with a rifled bore and a muzzle brake to extend the barrel to 16", rather than simply

8

using a 16" barrel with a rifled bore.[2]  Testing revealed that use of a barrel with a rifled bore over about 8" created dangerous pressures in the operating mechanism. SS Dec., App. 112.  When the cartridge is fired, the gases push the bolt carrier to the rear and open the bolt, ejecting the spent cartridge case.  If the barrel is too long, dangerous pressures may remain in the brass case during this sequence, potentially damaging the rifle and injuring the user.  EL Dec., App. 97-98.  Too much energy can also result in failures to extract and eject, and in extreme cases, case head failures, which can cause the firearm to blow up and injure the user.  EL Dec., App. 98-99.[3]

Third, use of the muzzle brake that extends the barrel by 9.5" effectively reduces recoil and muzzle rise (jump).  SS Dec., App. 112; EL Dec., App. 100-101.  A "muzzle brake" is defined as follows: "Device at the muzzle end usually integral with the barrel that uses the emerging gas behind a projectile to reduce recoil."  *NRA Firearms Sourcebook* 439 (2006).  "Recoil" means: "The rearward movement of a firearm resulting from firing a cartridge or shot shell.  Sometimes informally called 'kick.'"  *Id*. at 450.  "Muzzle jump" means: "The generally

---

[2]"Rifling" refers to "the spiral grooves formed in the bore of firearm barrel to impart rotary motion to a projectile."  *NRA Firearms Sourcebook* 453 (2006).

[3]A video demonstrated the sequence of initial bolt carrier motion and the bullet exit.  Adding barrel length allows the bullet to stay in the barrel longer, increasing the high pressure while the bolt carrier and bolt continue to open further.  EL Dec., App. 99-100.  The video is in the Administrative Record 882.

upward motion of the muzzle of a firearm which occurs upon firing." *Id*. at 439. App. 100.

Testing demonstrates that the full length of the muzzle brake contributes to the reduction in recoil. When a cartridge is fired and the gases escape from the muzzle, the gases flow against all of the surfaces of the muzzle brake, thereby reducing recoil.  As shown in the photographs, these gases leave gunpowder fouling on the surfaces of the entire length of the muzzle brake.  EL Dec., App. 101.

The device here is longer than other muzzle brakes so that the barrel is considered to be at least 16" in length and dangerous chamber pressures that would occur with use of a longer rifled barrel are prevented.  EL Dec., App. 106.  Were it not for the legal restriction on rifles with barrels under 16" in length, the device could be shorter.  Nonetheless, the length of the device further diminishes recoil and muzzle rise.  EL Dec., App. 106.  ATF did not include length as a factor in its list of possible silencer features.  See Letter, App. 51; EL Dec., App. 110.

Firing the rifle with a shorter muzzle device called the A2 results in the muzzle jerking upward and the shoulder stock kicking rearward.  See video in Administrative Record 883 (Doc. No. 15, Nov. 3, 2014).  Firing it with the subject

10

muzzle brake keeps the muzzle in a straight, horizontal position and reduces kick. See video in Administrative Record 884; EL Dec., App. 101-102, 104.

Reduction of recoil and muzzle climb is an advantage when using a 9 mm rifle, such as the rifle here, for home defense and target shooting. Muzzle brakes are even made for .22 caliber rimfire rifles. EL Dec., App. 106-107.

Sig Sauer's device is indisputably an effective muzzle brake in that it diminishes recoil and muzzle rise, and the plan is to market it as such. ATF did not challenge Sig Sauer's findings, and its acceptance of the fact that the device reduces recoil and muzzle rise pervades its Letter. SS Dec., App. 114.

Several of the features that ATF stated are commonly found in silencers (Letter, App. 51) are also found in muzzle brakes. These include ported tubes, i.e., bleed holes for gases to escape, and baffles, which redirect the gases in such manner as to reduce recoil and muzzle rise. EL Dec., App. 104-105 & illustrations. ATF described the device as a "monolithic baffle core" with "expansion chambers, baffles, angled baffles, holes or slots." Letter, App. 51. Because the device has no outer tube, it cannot be said to have "expansion

11

chambers." Muzzle brakes, including those shown in ATF's photos (Letter, App. 59), generally have "baffles, angled baffles, holes or slots." EL Dec., App. 106.[4]

Muzzle brakes generally have baffles. As ATF stated: "Monolithic baffles and muzzle brakes often share a common design feature, i.e., baffles." Letter, App. 58. ATF added that baffles in a muzzle brake use gases to diminish recoil, but "the baffles in a monolithic core redirect these gases and sound waves into a series of expansion chambers in order to reduce the report of the firearm." *Id*. But ATF's statement assumes the baffles are covered to make a silencer. The baffles in a monolithic core that are not covered diminish recoil like any other muzzle brake.

Testing conducted by Sig Sauer on the muzzle brakes shown in the ATF Letter (App. 59) demonstrates that assembly of an outer tube on virtually any muzzle brake creates a silencer. EL Dec., App. 106. ATF tested the Sig Sauer device by covering it with a rubber radiator hose and found that it produced a 14.28 dB reduction in sound. EL Dec., App. 108, citing ATF Letter, p. 15 n.2 (App. 62). Sig Sauer conducted the same test on a device ATF identified as a muzzle brake (App. 59) and got a similar result. EL Dec., App. 108. Covered with a radiator hose, the device (called the Big Chubby) reduced sound by 15.2 decibels

---

[4]The other items listed by ATF as possible silencer parts, such as steel wool, outer tubes, and end caps (used on lawn mower mufflers), have various non-silencer uses. EL Dec., App. 105-106.

(dB). EL Dec., App. 109. Thus, the device that ATF considers a conventional muzzle brake tested very similar to the Sig Sauer device. EL Dec., App. 110.

Threading on the front end of the device allows the attachment of an extended muzzle brake, flash suppressor, compensator, silencer, or blank firing adapter. EL Dec., App. 103.

The handguard on the first prototype rifle sample Sig Sauer sent to ATF, in April 2013, was longer than would be appropriate because a shorter handguard was unavailable at the time. The second sample, sent to ATF in June 2014, had the correct, shorter handguard that extends no further than the muzzle of the barrel, and it would be used for commercial production. EL Dec., App. 107-108. After the correct handguard was submitted, ATF suggested that the initial use of the longer handguard indicated an intent to have a cover over the muzzle brake. Letter, App. 60. But as noted, the shorter handguard was the one that would be used in production.

Finally, Sig Sauer's invoice dated 7/10/2014 submitting samples to ATF used the same part number (8100045) and the word "silencer" for both the subject muzzle brake and a part that can be used with other parts to make a silencer. Letter, App. 62-63. ATF's initial letter dated August 26, 2013, opined that the device is a silencer and instructed: "Upon receipt, you must register this silencer no

13

later than the close of the next business day."[5]   App. 23.   Sig Sauer's calling the item a "silencer" and using the same part number for both samples would preclude unrestricted sales and reflected its compliance with ATF's determination.   Sig Sauer stated that that will change if a court rules otherwise.  SS Dec., App. 116.

*ATF's Final Decision on Remand*.  "Upon review of the submitted affidavits dated September 18, 2014, ATF's classification decision remains unchanged." Letter from Earl Griffith, Acting Chief, Firearms and Ammunition Technology Division, to Steven Shawver, October 2, 2014.  Add. 19.  ATF acknowledged Sig Sauer's "purported intended use of the item," but failed to discuss the content of Sig Sauer's submission.  *Id*.

## SUMMARY OF ARGUMENT

This case involves an attachment to a rifle barrel known as a muzzle brake. The muzzle brake here is intended to reduce recoil (kick) and muzzle rise when the rifle is fired, to extend the barrel to the 16 inch legal minimum, and to allow safe pressures in firing.  Consumers could be expected to purchase and use the product without any modifications.

Other devices and parts may be added to the muzzle brake.  These include a flash suppressor, a blank firing device, or – for those wishing to go through the

---

[5]For registration, a notice of each firearm (defined to include a silencer) manufactured must be "filed by the manufacturer no later than the close of the next business day."  27 C.F.R. § 479.103.

legal process – a silencer.  The other parts required to assemble a silencer include an outer cover, which has a serial number and manufacturer markings, and an end cap.  Because it accommodates various intended uses, as a matter of law the muzzle brake is not a "part intended *only* for use in . . . assembly or fabrication" of a silencer, and is thus not a firearm silencer as defined in 18 U.S.C. § 921(a)(24).  In disregard of the word "only" in this definition, however, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) decided that the device is a silencer because, with the addition of other parts, it can be adapted to such use.  The district court upheld that decision.

The statutory language "intended only for use" prevents ATF from classifying parts with dual uses as silencers.  The statutory, administrative, and judicial background clarifies long-standing recognition of intended uses of muzzle brakes to reduce recoil and to ensure that barrels are at least 16 inches in length to avoid restrictions.  Because the part at issue may be used either as a muzzle brake or as a component of a silencer, the part is not "intended only for use" in assembling a silencer.

*United States v. Crooker*, 608 F.3d 94, 97 (1st Cir. 2010), held that a person's actual intent is an element of whether an item meets one of the three definitions of being a firearm silencer, and rejected ATF's position that mere

15

adaptability of a device to use as a silencer sufficed. Those definitions include a device "for" muffling a firearm, a combination of parts designed and intended for making a silencer, and a part "intended only for use" in making a silencer, which the court viewed as "gradations of purpose made more rigorous as the statute extends from a self-sufficient device to a collection of parts to a single part." *Id.* Disregarding the purpose of the muzzle brake here to reduce recoil and to obtain the required barrel length, ATF applied the same adaptability test that *Crooker* rejected.

Precedents on which *Crooker* relied held that one factor in knowing one's intent may be whether a device actually works as a muzzle brake, which the device here indisputably does. Precedent also exists in a civil case holding that it was arbitrary and capricious for ATF to classify a device as a silencer based only on a checklist of parts with various uses. Here, the district court upheld ATF's use of the same checklist, ignoring Sig Sauer's actual intent as reflected both subjectively and in the objective performance of the muzzle brake.

No deference is due ATF as to the undeniably clear meaning of "intended only for use" and its equally clear application to the muzzle brake here. The definition at issue is in the federal criminal code, 18 U.S.C., and its meaning is the same in civil litigation as in a criminal prosecution. Even aside from the statute

16

being criminal, deference would not be due the agency given that its classification is just an informal opinion applying a statute that needs no clarification.

In concluding that the device is "intended only for use" in making a silencer, ATF not only minimized its intended use as a muzzle brake to reduce recoil, it also wholly ignored its intended use as a method to extend the barrel to 16 inches in length to avoid legal restrictions, and to do so in a manner that avoids dangerous pressures when firing. ATF cannot evade its responsibility to examine the relevant data or to offer an explanation for its decision that runs counter to the evidence.

As reflected in the transcript of oral argument, the district court took ATF to task for disregarding the dual uses of the muzzle brake and relying on the adaptability test rejected by *Crooker*. In its final decision, by contrast, the court upheld ATF's counter-factual assertion that the device is "intended *only* for use" in a silencer.

The district court sought to excuse ATF's failure to address Sig Sauer's intent to use a long muzzle brake to achieve the 16 inch minimum barrel length by stating that Sig Sauer raised it only at the end of the proceedings, implying that this was a procedural default. In fact, the issue was raised in the very first submission to ATF. Moreover, in seeking a remand to the agency after the complaint was

17

filed, ATF committed itself to considering Sig Sauer's post-remand submissions, and the court approved this very arrangement.

The district court also erred in concluding that ATF's classification of the part is rational and based on substantial evidence in the record. There is *no* evidence that Sig Sauer intended the part to be used "only" in a silencer. The district court glossed over or ignored the evidence Sig Sauer provided that the part was designed and intended for dual purposes.

In sum, the muzzle brake is intended for use to reduce recoil, to provide a barrel 16 inches in length to avoid legal restrictions, and to ensure safe pressures when firing. For those wishing to go through the legal procedures, a serialized outer cover and an end cap can be acquired to assemble a silencer, but this is by no means the only possible use. Under the clear language of the statute and the unchallenged facts, the muzzle brake is not a "part intended only for use" in making a silencer as defined in 18 U.S.C. § 921(a)(24).

## ARGUMENT

### Standard of Review

"Given that this issue depends upon the proper interpretation of the relevant statutory language, we review this question of law *de novo*." *United States v.*

*Carter*, 752 F.3d 8, 13 (1st Cir. 2014).  "A grant of summary judgment must be reviewed *de novo*."  *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015).

## Introduction

This case concerns whether a muzzle brake is a silencer.[6]  The muzzle brake here is intended to reduce recoil and muzzle rise, to extend the barrel to the 16 inch legal minimum, and to allow safe pressures in firing.  Many consumers could be expected to purchase and use the product without any modifications.  Others may add other muzzle devices, one of which may be – for those wishing to go through the legal process – the parts to make a silencer.  Those parts would include a serialized outer cover and an end cap.

As a matter of law, the muzzle brake at issue is thus not a "part intended *only* for use in . . . assembly or fabrication" of a silencer as defined in 18 U.S.C. § 921(a)(24) (emphasis added).  No legal or factual basis exists for ATF's classification to the contrary, which should be set aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  See 5 U.S.C. § 706(2)(A).

---

[6] "A muzzle brake is a device attached to the muzzle (exit end) of a gun barrel to reduce perceived recoil and barrel 'bounce' that occurs when the gun is fired." *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 288 n.1 (5th Cir. 2004).

19

## I.  THE STATUTORY TEXT AND LEGISLATIVE PURPOSE CLARIFY THAT A MUZZLE BRAKE IS NOT A "PART INTENDED ONLY FOR USE" IN ASSEMBLY OR FABRICATION OF A SILENCER

### A.  In the Statutory Text, "Intended Only for Use" Precludes Dual Purposes

The definition of silencer was enacted in the Firearms Owners' Protection Act ("FOPA"), § 101, P.L. 99-308, 100 Stat. 449, 451 (1986), which amended the Gun Control Act of 1968.  As adopted, 18 U.S.C. § 921(a)(24) provides:

> The terms "firearm silencer" and "firearm muffler" mean [1] any device for silencing, muffling, or diminishing the report of a portable firearm, including [2] any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and [3] any part intended only for use in such assembly or fabrication.  (Bracketed numbers added.)

Each of these definitions has intent standards.  Under definition 1, a lawn-mower muffler could be adapted for use on a firearm, but it is not a device "for" muffling a firearm.  Under definition 2, various household items do not constitute a silencer merely because a combination of such parts could be assembled into a silencer.  And under definition 3, a muzzle brake or other part with dual uses that could, with the addition of other parts, be adapted for use in a silencer is not a "part intended only for use" in a silencer.  However, the additional parts necessary and intended for making a silencer – the outer tube and end cap – would be a silencer under definitions 2 or 3.  Only definition 3 is pertinent here, as that was the definition that ATF claimed is applicable to the device at issue.  App. 23, 39, 62.

20

The terms "intended only for use" pose no mystery. *Boivin v. Black*, 225 F.3d 36, 40 (1ˢᵗ Cir. 2000), relates:

> We begin, as we must, with the language of the statute. . . . We assume that the words that Congress chose to implement its wishes, if not specifically defined, carry their ordinary meaning and accurately express Congress's intent. . . . If the gist of the statute is obvious and the text, given its plain meaning, produces a plausible scenario, 'it is unnecessary – and improper – to look for other signposts . . . .'"
> (Citations omitted.)

Congress could not have been clearer in its use of the term "only." "The plain meaning of 'only' has the purpose and effect of excluding the remaining universe." *Farrell v. Commissioner of Internal Revenue*, 136 F.3d 889, 894 (2ⁿᵈ Cir. 1998). That court added:

> The dictionary definitions of "only" include: that which "is without companions or associates"; "as a single solitary fact or instance or occurrence: as just the one simple thing and nothing more or different"; and "being one or more of which there exist no others of the same class or kind." Webster's Third New International Dictionary 1577 (3d ed.1993). In other words, it is a word that connotes exclusivity.

*Id*. at 895.

While the district court here ultimately ruled for ATF, at oral argument it made statements and elicited concessions from ATF counsel demonstrating that the device here is *not* "intended only for use" in a silencer and thus is not encompassed within the plain text of § 921(a)(24). The court stated, and ATF agreed, with the following: "So if the part . . . is intended for more than use as a silencer, it's

21

intended for use as a silencer, but it's also intended for use as a muzzle brake, it's not a silencer." Transcript of Motion Hearing Before the Honorable Paul J. Barbadoro, July 17, 2015, Add. 22 (hereafter "Trans. Mot. Hear.").[7] After ATF conceded that it never denied that the device "doesn't function as a muzzle brake," the court stated: "Now, if you said in your response, we've tested this and it doesn't function as a muzzle brake, therefore, it can't be intended to be a muzzle brake, you'd have no trouble if the evidence supported that." Add. 24-25. The court added that "you haven't presented any argument that the third prong of the statute, when it says only, doesn't mean only." Add. 25-26. The following ensued:

> THE COURT: The evidence in the case is absolutely clear that the manufacturer intends this to be used and marketed in two ways. One, as a muzzle brake if sold alone and operated without the benefit of the cover. And two, as a silencer for people that want to put a cover on it. . . . Let's assume you do testing and the testing shows it can do both of those things, okay? Is that a part intended only for use in an assembly or fabrication of a silencer?
> MR. RYAN [ATF counsel]: No, your Honor.

Add. 30.

The court further remarked, and counsel for Sig Sauer agreed, that "the cover and the [end] cap would be fully regulable [*sic*] under the NFA, and one could not assemble a silencer from what you're doing without getting an NFA regulated part." Trans. Mot. Hear., App. 360. Regulations require that the serial

---

[7] The complete transcript is at App. 275.

22

number, manufacturer, and other required markings must be conspicuous, and thus such markings generally appear on the outer cover or tube.[8]

The clear language of the statute as applied to the undisputed facts here left little option to ATF in making the above admissions.  While the district court would rule to the contrary, its opinion is totally at odds with the conclusions the court reached in its above colloquies with counsel.

### B. The Statutory, Administrative, and Judicial Background Show that Use of a Muzzle Brake to Decrease Recoil and to Increase Barrel Length Precludes the Intent to Use as a Silencer

The statutory history, administrative interpretation, and judicial construction preceding enactment of the definition in FOPA demonstrate both the general continuity of intent standards and the exclusion of muzzle brakes intended to reduce recoil and to extend barrel length from being considered as silencers.

As originally passed and as reenacted, the NFA defined "firearm" in part as "a muffler or a silencer *for* any firearm . . . ." P.L. 474, 48 Stat. 1236 (1934); P.L.

---

[8] See 27 C.F.R. §§ 478.92(a)(1) and 479.102 (firearms must be conspicuously marked).  "ATF strongly recommends that manufacturers place all required markings on the outer tube of the silencer, as this is the accepted industry standard."  ATF, *National Firearms Act Handbook*, ATF E-Publication 5320.8, at 175 (2009).  http://www.atf.gov/files/publications/download/p/atf-p-5320-8/atf-p-5320-8.pdf.

90-618, 82 Stat. 1213, 1230 (1968) (emphasis added).[9] That same critical term "for," which set a clear standard of intent, also appeared in an NFA regulation that was on the books until enactment of FOPA:

> Muffler or silencer.  Any device for silencing or diminishing the report of any portable weapon, such as a rifle, carbine, pistol, revolver, machine gun, submachine gun, shotgun, fowling piece, or other device from which a shot, bullet, or projectile may be discharged by an explosive, and is not limited to mufflers or silencers for "firearms" as defined.

27 C.F.R. § 179.11 (1985); origin in 6 F.R. 4935 (Sept. 30, 1941); replaced with FOPA definition in 51 F.R. 39615, 39630 (Oct. 29, 1986).

ATF's predecessor agency did not consider a muzzle brake to be a silencer under the above provisions, for it opined that permanently attaching "a sleeve-type muzzle brake to the muzzle end of a short barreled rifle" to lengthen the barrel would remove the rifle from the short-barreled category (which was 18 inches at that time).  Revenue Ruling 55-570, 1955-2 C.B. 481, 1955 WL 10164 (IRS RRU). App. 273.[10]  The ruling did not specify that the muzzle brake must be of any given

---

[9]Also as originally passed, the GCA defined "firearm" in part as "any firearm silencer or firearm muffler," without defining those terms.  P.L. 90-618, 82 Stat. 1213, 1214 (1968).

[10]That remains ATF's position today.  "The ATF procedure for measuring barrel length is to measure from the closed bolt (or breech-face) to the furthermost end of the barrel or permanently attached muzzle device."  ATF, *National Firearms Act Handbook* 6 (ATF E-Publication 5320.8, 2009).  SS Dec., App. 111-12.

length, but verified that the above would "remov[e] it from the classification of a firearm as defined in" the NFA. *Id.*

The above was reflected in pre-FOPA judicial decisions. *United States v. Schrum*, 346 F. Supp. 537, 540 (E.D. Va. 1972), distinguished silencers from other devices as follows:

> An example would be a barrel extension or a device to reduce the kick of a weapon which incidentally reduces the noise level. We feel these legitimate attachments would not be covered by the definition of a silencer, in and of themselves, because they do have as one of their primary functions the silencing or reducing of noise. Any such reduction is merely incidental to a legitimate purpose and unavoidable.[11]

The above intent would be expressed in the passage of the FOPA bill in 1986. Known in the House as the Volkmer substitute, Reps. Harold Volkmer and Bill McCollum formulated the definition of silencer that would pass.[12] Volkmer engaged in the following colloquy with Rep. Larry Craig to specify muzzle attachments that are not considered to be silencers:

---

[11]Similarly, *United States v. Hurd*, 642 F.2d 1179, 1182 (9th Cir. 1981), upheld a jury instruction excluding from the definition of a silencer a device the primary purpose of which "was to stabilize the barrel, reduce recoil and eliminate the flash caused by firing," and of which "noise reduction was an incidental function . . . ."

[12]132 Cong. Rec., 99th Cong., 2d Sess., H1675, H1700 (1986). When the Volkmer substitute, H.R. 945, passed, it then became "H.R. 4332, as passed by the House" (132 Cong. Rec. H1753), while "a similar House bill (H.R. 4332) [the Judiciary Committee bill] was laid on the table." *Id.* at H1757.

Mr. CRAIG. The language of the silencer definition . . . states that a silencer is "any device [f]or silencing . . ." I would like to know if this term is designed to change the current interpretation. For example, according to BATF, the current law does not include conventional chokes, muzzle breaks [*sic*], flash hiders, and compensators that are not designed or altered to be silencers, even though these devices may quash sound in addition to their other lawful purposes.

Mr. VOLKMER. My substitute, as modified by the McCollum amendment, does not change existing law. No conventional choke, muzzle breaks [*sic*], flash hiders, or compensators will fit within the definition of silencer in the substitute because they are not "devices for silencing . . ." Each of these devices has a common sporting purpose totally apart from muffling sound. If someone modified these legitimate devices however for the purpose of silencing, then the modified device would be a silencer.

132 Cong. Rec. H1757 (1986).  App. 274.

The references to "the current interpretation" and "existing law" refer to the statutory history, administrative interpretation, and judicial construction set forth above.  While the words "any part intended only for use in . . . assembly or fabrication" of a silencer could not be clearer in excluding a muzzle brake, the above colloquy nicely ties the text with its history. See *United States v. Marshall*, 753 F.3d 341, 345 (1st Cir. 2014) ("[W]e apply the presumption that Congress was aware of these earlier judicial interpretations and, in effect, adopted them.").

Finally, in passing the Firearms Owners' Protection Act, Congress made findings that express its intent about how the law should be interpreted:

[A]dditional legislation is required to reaffirm the intent of the Congress, as expressed in section 101 of the Gun Control Act of 1968, that "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap-shooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes."

§ 1(b), P.L. 99-308, 100 Stat. 449.

In sum, the statutory text, statutory background, administrative interpretation, and judicial precedents all recognize the intended uses of muzzle brakes to reduce recoil and as a way to increase barrel length to avoid the short-barreled rifle category, and that such uses do not result in status as a silencer.

## II.  THE PLAIN TEXT AS APPLIED IN *UNITED STATES v. CROOKER* (1st Cir. 2010) VERIFIES THAT "INTENDED ONLY FOR USE" PRECLUDES A STANDARD OF CAPABILITY FOR ADAPTATION WITH THE ADDITION OF OTHER PARTS

### A.  Under *Crooker* and Related Decisions, Specific Intent to Use an Item as a Silencer is Required

FOPA's definition kept the existing reference to a device "for" silencing a firearm, and added a "combination of parts, designed or redesigned, and intended for use in assembling or fabricating" a silencer, and "any part intended only for use in such assembly or fabrication." § 921(a)(24).  The requirement of intent is

27

enhanced progressively for each of these three definitions, with the third requiring the highest level of intent, which must be exclusive.

This was the definitive focus of the First Circuit in *United States v. Crooker*, 608 F.3d 94 (1st Cir. 2010), which resolves the issues here. *Crooker* involved "a device designed to muffle the sound of an airgun," which is not a "firearm," but which could be adapted for use on a firearm. *Id.* at 95. It was described as "a cylinder made of black metal with a hole running through it, threading that allowed attachment to the muzzle of the airgun and baffles inside." *Id.* ATF was able to attach it to an actual firearm by threading an "adapter" that it supplied to the barrel and the silencer. *Id.* at 96.[13]

*Crooker* rejected an objective, no-intent test identical to what ATF argues here. It did not suffice that "Crooker's device fitted with an adapter would be objectively capable of functioning as a silencer for a firearm," *id.* at 97, just as it

---

[13]Explaining that an airgun is not a "firearm," the court took note of ATF Ruling 2005-4 ("paintball gun, which uses compressed air to expel a projectile, is not a 'firearm' under the statute"). *Id.* The ruling opined that a permanently-affixed silencer for a paintball gun is not a "firearm silencer" because "the device is not one for diminishing the report of a portable firearm." See https://www.atf.gov/files/regulations-rulings/rulings/atf-rulings/atf-ruling-2005-4.pdf. The device had a ported barrel "to allow the escape of gases from a fired round" and an outer sleeve that "dampens or muffles the sound when a round is fired," characteristics which are "similar to those of conventional commercial silencers," and it reduced sound when removed from the paintball gun and affixed to a firearm. *Id.*

does not suffice here that the muzzle brake could be fitted with an outer cover and end cap to make a silencer.

In language that is dispositive here, *Crooker* observed that "the statute by its terms requires something more than a potential for adaptation and knowledge of it. The statute does not refer either to capability or adaptation; it speaks of a device 'for' silencing or muffling. The ordinary connotation of the word is one of purpose." *Id*. at 97. No evidence existed that "either Crooker or the maker of the airgun silencer intended that it be used to silence a firearm . . . ." *Id*. Noting the statute's further phrases "intended for use" and "intended only for use," the Court "view[ed] all three tests as gradations of purpose made more rigorous as the statute extends from a self-sufficient device to a collection of parts to a single part." *Id*.

Since the airgun silencer required a further "part" (the adapter), it could have fallen "within one of the 'parts' definitions that require intent." *Id*. Intent to use, not objective capability of use or knowledge of such capability, was critical, for otherwise the definition "could also extend to a soda bottle or even a potato. The peculiar problem of silencers is that many objects, including relatively innocent ones, have some capacity to muffle the sound of a shot." *Id*.

Distinguishing the definitions of "silencer" and "machinegun," *Crooker* explained: "But the machine-gun provision, by contrast to the silencer definition,

29

explicitly adopts a test of objective capability: it covers any weapon '*which shoots, is designed to shoot, or can be readily restored to shoot*' automatically multiple shots with a single trigger pull." *Id*. at 98, quoting 26 U.S.C. § 5845(b) (emphasis added by court). As the Court added: "Nor is the difference in language difficult to explain: something is or is not an automatic weapon, but the range of physical objects that can muffle a firearm is so large and of so many alternative uses that some filtering restriction is needed to prevent overbreadth and possibly vagueness." *Id*.

"To read the statute literally, as we do, is conventional with criminal statutes in order to provide fair notice," the Court concluded, ordering an acquittal. *Id*. at 99, citing *United States v. Lanier*, 520 U.S. 259, 266 (1997). Obviously no deference was due to the agency's interpretation. This Court's plain reading applies even more so to this case, which involves a mere single part rather than a complete device that was a non-firearm silencer.

In short, *Crooker* rejected the argument that if an object is capable of being adapted to a given use, it is intended for that use.[14] As the district court in this case said to ATF counsel: "You're trying to argue the same standard that you argued in

---

[14]As applied to firearms generally, a "capability" test would know no bounds – since a firearm is capable of use to murder, a person who possesses a firearm intends to use it to murder.

*Crooker* essentially, because if it functions as a silencer, it's objectively intended
to be a silencer." Trans. Mot. Hear., Add. 29. The court elaborated as follows:

> To the extent that *Crooker* is read to say that subjective intent is
> required, because . . . that's how every judge in the First Circuit
> construes *Crooker* when they give an instruction in a [§] 921 case,
> which we do all the time, you're saying that's wrong. . . . We now
> have to instruct every jury in the United States with a [§] 921 case
> [that] . . . the government need not prove that this defendant . . .
> subjectively intended that this device be used as a silencer, it is
> sufficient if he objectively intended it.

Add. 39. See *id*. at 41 ("Every court and every judge across the country in criminal
cases has been misinterpreting what intended means.") (statement of the court to
ATF counsel).

In its final decision, the district court recognized that "the subjective intent
requirement applies most 'rigorously' to single silencer parts." Memorandum &
Order, Add. 12, citing *Crooker*, 608 F.3d at 97. However, it decided that "ATF
applied the proper subjective intent test" because it claimed to have considered the
manufacturer's intent and because objective evidence is relevant to subjective
intent. Add. 12-13.

Yet just as the "objective evidence" in *Crooker* did not undermine his intent
that the device was "for" an airgun, the evidence here only supports Sig Sauer's
intent that its device be used as a muzzle brake and for other purposes, that it
intended the length of the device to ensure that the barrel is sixteen inches to avoid

31

restrictions, and that it intended the respective lengths of the rifled barrel and the device to ensure safe pressures. Because of the terms "intended only for use," it is irrelevant that, for those wishing to go through the legal process, the device may – with the addition of a serialized outer cover and an end cap – be assembled as a silencer.

In contrast to ATF's no-intent adaptability test, the test for how a device's objective features can indicate the intent of its possessor is well illustrated in a case relied on by *Crooker* (at 99 n.3), *United States v. Syverson*, 90 F.3d 227 (7th Cir. 1996), *cert. denied*, 519 U.S. 982 (1996). *Syverson* involved a metal cylinder that could reduce the report of a firearm. *Id.* at 229. The court stated: "Because Syverson was the designer and manufacturer of the cylinder, his intentions determine whether it purported to be a silencer." *Id.* at 232. Evidence existed that the defendant "intended the cylinder to be a silencer" instead of a muzzle brake because "muzzle breaks [*sic*] usually have slots cut into them; these slots are the means by which muzzle breaks disperse the hot gases expelled from a gun barrel." *Id.* The "cylinder had no slots" and "would not have done much, if anything, to reduce the recoil of a firearm," but it "did reduce the report of a pistol, albeit slightly." *Id.*

32

By contrast, the muzzle brake at issue here differs in all three respects – it *has* slots, *reduces* recoil, and *increases* the report of a firearm. Along with the 16 inch barrel length, these physical attributes demonstrate Sig Sauer's intended uses of the device, regardless of whether that intent is characterized as "subjective" or "objective." Under any standard of review of ATF's decision, these basic facts preclude a finding that the device is "intended only for use" in making a silencer.

*Crooker* relied on other precedents holding that "intent or purpose is an element of the initial silencer definition . . . as it plainly is for the parts definitions . . . ." *Id*. at 98-99 & n.3, citing, *inter alia*, *United States v. Carter*, 465 F.3d 658, 667 (6th Cir. 2006) (*per curiam*) (the silencer provision "focuses on the intended *application* of a silencer, not its actual demonstrated operation" and "indicates a concern for the *purpose* of the mechanism . . . not the *function*") (emphasis in original), *cert. denied*, 550 U.S. 964 (2007). The device in *Carter* – a cylinder containing another tube with holes in it and wrapped with steel wool, screwed onto a pistol barrel – indicated its possessor's true intent to make a silencer. *Id*.[15]

*Crooker* also cited *United States v. Klebig*, 600 F.3d 700, 719 (7th Cir. 2010), which focused on whether the defendant "intended to use the oil filter . . . as

---

[15]Similarly, in *United States v. Taylor*, 100 Fed. Appx. 305, 307-08 (5th Cir. 2004), defendant "intended for the items found in his shop to be silencers or silencer parts." They consisted of tubes with caps on the end, one having insulation inside of it, and one was attached to a firearm. *Id*. at 307-08 & n.1.

a silencer rather than as a flash suppressor . . . ."  Use as a flash suppressor "does not require registration."  *Id*. at 704.  Testing revealed that "the oil filter reduced the rifle report by approximately six decibels."  *Id*. at 708.  As in *Crooker*, under definition 1, a device is or is not "for" silencing a firearm depending on the specific intent of the possessor.

The intent standard is enhanced under definition 3, under which a part must be "intended only for use" in making a silencer.  As noted in *United States v. Rose*, 522 F.3d 710, 720 (6th Cir. 2008), "a dummy silencer that is not intended to become a silencer" is not a silencer, but since "[t]he statutory definition itself encompasses parts intended for use in fabricating silencers," then "a dummy silencer which [defendant] planned to convert into a silencer" would be a silencer.

In sum, this Court's decision in *Crooker* requires a showing of intent under definition 1 that a device be used "for" a silencer and held that adaptability for such use does not suffice.  This case involves the even more rigorous definition 3, under which the device must be shown as "intended only for use" to make a silencer, a standard that is inapplicable to parts with dual uses.

### B.  ATF's Silencer Classification Held to Be Arbitrary and Capricious in *Innovator Enterprises*

The above precedents were criminal cases, but ATF's classification of a purported muzzle brake as a silencer was held to be arbitrary and capricious and

34

set aside in a civil case, *Innovator Enterprises, Inc. v. Jones*, 28 F. Supp.3d 14  (D. D.C. 2014) ("*Innovator*").  The device reduced recoil and muzzle rise.  *Id*. at 18.

In *Innovator*, the FTB decided that the device was a silencer because it purportedly had three out of eight physical characteristics on a list of items consistent with those used on silencers: an expansion chamber, a ported inner tube, and an end cap.  *Id*. at 19.  Having parts on a list was not a satisfactory explanation, for that did not mean that the device "is actually capable of (or designed for) 'diminishing the report of a portable firearm,'. . . ."  *Id*. at 25.  "A mouse is not an 'elephant' solely because it has three characteristics that are common to known elephants: a tail, gray skin, and four legs."  *Id*.  FTB committed the same fallacy here, except that Sig Sauer's device allegedly had only a single feature of a "known silencer," and it was not even on FTB's list.  EL Dec., App. 105-106.

*Innovator* found that ATF failed to examine the relevant data because it conducted no test to determine if the device "is actually capable of 'diminishing the report' of a gunshot."  28 F. Supp.3d at 26.  The court found both the purpose and effectiveness of a device to be relevant.  *Id*. at 27.  If only purpose is relevant, "then a pink silk ribbon tied in a bow around the barrel of a rifle could be a 'firearm silencer' – as long as the ribbon's (delusional) inventor designed the

ribbon with the hopes that it could be used 'for diminishing the report' of a gunshot." *Id.* at 28.

The administrative record and the complaint revealed the device's purpose to be "to reduce recoil, muzzle flash, and muzzle rise . . . ." *Id.* at 29. Yet it remained to be seen whether the device diminished the report of a firearm, as no test had been conducted. The court thus remanded the matter to the agency for further findings. *Id.* at 30.

That is where the posture of the case here parts company from *Innovator*. *Innovator* involved a complete device under definition 1 that ATF had not tested for sound reduction, for which a remand was appropriate. This case has already been through a full remand. ATF acknowledges that the device here increases rather than diminishes sound, and that it was "manufactured and marketed by your company as a <u>muzzle brake</u>," but that did not change its opinion that the device "is intended *only* for use" in a silencer under definition 3. App. 23, 39, 48, 62. That is wrong as a matter of law.

In sum, this Court in *Crooker* held that a complete device that could be adapted for use as a silencer was not "for" that purpose and was thus not a silencer. *Innovator*, the only civil case on the subject, found that ATF's classification of a device as a silencer was arbitrary and capricious because the classification was

based merely on the basis that it had parts on ATF's list of "silencer" parts.  This is a far easier case, in that it involves the strictest definition of silencer requiring that a part be "intended only for use" in making a silencer where Sig Sauer has clearly shown other reasonable and intended uses.

### III.  THE MEANING OF "INTENDED ONLY FOR USE" IS CLEAR, THE ISSUE ARISES UNDER A CRIMINAL STATUTE, AND NO DEFERENCE TO AGENCY OPINION IS DUE

#### A.  The Definition of Silencer is in a Criminal Statute, and Its Meaning is the Same in a Civil Case as in a Criminal Case

The device at issue would not be considered a silencer in a criminal prosecution under the plain text of § 921(a)(24), and it cannot be considered a silencer in this case.  "To read the statute literally, as we do, is conventional with criminal statutes in order to provide fair notice . . . ."  *Crooker*, 608 F.3d at 99. Violation of the laws on silencers is punishable by severe felony penalties[16] and, like crimes in general, conviction requires strict proof.[17]  As the district court aptly stated: "Every time I have a criminal prosecution, they don't produce a letter from the director of ATF and say this is what the statute means, you are bound by law to follow the director of ATF's interpretation of this."  Trans. Mot. Hear., Add. 21.

---

[16]*See* 18 U.S.C. § 924(a); 26 U.S.C. § 5861.

[17]"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime."  *Brown v. O'Brien*, 666 F.3d 818, 824 n.1 (1st Cir. 2012) (citation omitted).

37

Deference to agency opinion is inapplicable in this context, as "we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context . . . ." *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004). "A single statute with civil and criminal applications receives a single interpretation." *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 727 (6th Cir. 2013). *See United States v. Santos*, 553 U.S. 507, 523 (2008) ("Our obligation to maintain the consistent meaning of words in statutory text").[18]

Moreover, "we have never held that the Government's reading of a criminal statute is entitled to any deference." *United States v. Apel*, 134 S. Ct. 1144, 1151 (2014)[19] (also noting that executive branch "views may reflect overly cautious legal advice . . . . Or they may reflect legal error."). *See Gonzales v. Oregon*, 546 U.S. 243, 264 (2006) (Attorney General not entitled to *Chevron* deference in interpretation of criminal law).

This principle is well-illustrated in *United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992), a civil case holding that certain dual use parts did not constitute a rifle, defined in part as a weapon "intended to be fired from the

---

[18]*And see Clark v. Martinez*, 543 U.S. 371, 382 (2005) (a statute is not "a chameleon, its meaning subject to change" from case to case).

[19]This oft-cited statement of the rule originated in *Crandon v. United States*, 494 U.S. 152, 177 (1990) (Scalia, J., concurring) ("[W]e have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference.").

shoulder," having a barrel less than 16 inches in length.  26 U.S.C. §5845(a)(3), (c).  The Court held that a gun manufacturer that markets parts intended only to be assembled as a pistol or as a long-barreled rifle, does not make a short-barreled rifle even though the parts "can readily be assembled" as such.  *Id*. at 507, 509-10.[20]  Tellingly, the Court rejected the equivalent to ATF's "adaptability" and "objective intent" arguments here, based on "the mere possibility of their use to assemble a regulated firearm" where no intent to do so existed.[21]  *Id*. at 513.

*Thompson/Center* did not involve "a set of parts that could be used to make nothing but a short-barreled rifle . . . ." *Id*. at 510-11.  "[W]e are not dealing with an aggregation of parts that can serve no useful purpose except the assembly of a firearm, or with an aggregation having no ostensible utility except to convert a gun into such a weapon."  *Id*. at 513-14.  Instead, the case involved an unregulated pistol that "can be converted not only into a short-barreled rifle, which is a regulated firearm, but also into a long-barreled rifle, which is not." *Id*. at 514.

---

[20]"[T]he definition of 'rifle' requires that it be 'intended to be fired from the shoulder,' § 5845(c), and the only combination of parts so intended, as far as [the manufacturer] is concerned (and the record contains no indication of anyone else's intent), is the combination that forms a rifle with a 21-inch barrel."  *Id*. at 523 (Scalia, J., concurring).  Similarly, the record here is devoid of any indication that the manufacturer intends that the muzzle brake be "only for use" in assembly of a silencer.

[21]The district court declined to opine on the application of *Thompson/Center* to this case.  Add. 14 n.9.

Similarly, the muzzle brake here has utility exactly as it would be manufactured by Sig Sauer – it reduces recoil, meets the 16 inch barrel requirement, and avoids dangerous pressures.  Any consumer who wished to make a silencer would have to go through the legal process and then would have to obtain the serialized outer cover and the end cap.  In *Thompson/Center*, the consumer already had the parts necessary to make a restricted rifle, and would only need to go through the legal process if he or she wished to assemble the parts as such.

*Thompson/Center* held that the definition of a restricted firearm must be read exactly the same in a civil case as in a criminal case.  Although being "construe[d] now in a civil setting, the NFA has criminal applications . . . . It is proper, therefore, to apply the rule of lenity and resolve the ambiguity in Thompson/Center's favor."[22]  *Id*. at 517-18.  Thus, "the Contender pistol and carbine kit when packaged together by Thompson/Center have not been 'made'

---

[22]"The rule of lenity . . . is a rule of statutory construction whose purpose is to help give authoritative meaning to statutory language. It is not a rule of administration calling for courts to refrain in criminal cases from applying statutory language that would have been held to apply if challenged in civil litigation."  *Id*. at 519 n.10.  *See Crandon*, 494 U.S. at 168 (if ambiguity arises, "we are construing a criminal statute and are therefore bound to consider application of the rule of lenity.").

into a short-barreled rifle . . . ." *Id*.[23]  Based on that holding, the manufacturer was free to market the firearm without special restrictions.

Long-standing precedent indicates that the same interpretative rules apply to judicial review under the Administrative Procedure Act. In *FCC v. American Broadcasting Co.*, 347 U.S. 284, 289 n.4 (1954), APA challenges were mounted against agency regulations that were alleged to be beyond the agency's power. Given that "penal statutes are to be construed strictly," the Court noted: "It is true . . . that these are not criminal cases, but it is a criminal statute that we must interpret.  There cannot be one construction for the Federal Communications Commission and another for the Department of Justice."  *Id*. at 296.  But if "the broad construction urged by the [agency]" is adopted, "the same construction would likewise apply in criminal cases." *Id*.[24]

---

[23]That would have been the same result if no need existed to apply the rule of lenity.  An unambiguous criminal statute would have the same meaning in a civil case.

[24]While decided after *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), the Court did not accord any deference to the agency's interpretation.  *Skidmore* involved entitlement to overtime pay – a purely civil matter with no criminal implications. In any event, as *Skidmore* states, it is for the courts "to find facts and to determine in the first instance whether particular cases fall within or without the Act," *id*. at 137, and an agency's persuasive power depends in part on "the thoroughness" of its consideration and "the validity of its reasoning . . . ."  *Id*. at 140.

The non-deference rule was set forth recently in *Abramski v. United States,* 134 S. Ct. 2259, 2274 (2014), in rejecting ATF's interpretation of a GCA provision:

> The critical point is that criminal laws are for courts, not for the Government, to construe. . . . We think ATF's old position no more relevant than its current one – which is to say, not relevant at all. Whether the Government interprets a criminal statute too broadly (as it sometimes does) or too narrowly. . . , a court has an obligation to correct its error.

In sum, the muzzle brake at issue is not "intended only for use" in making a silencer under the plain statutory text and under this Court's interpretation in *Crooker*. Section 921(a)(24) is a criminal statute whose meaning does not change in a civil case and of which no deference is due to ATF.

### B.  The Meaning of "Intended Only for Use" is Clear, and ATF is Not Otherwise Entitled to Deference

No ambiguity exists regarding the meaning of "intended only for use." "First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron USA v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984).  See *Santana v. Holder*, 731 F.3d 50, 55 (1st Cir. 2013).

42

Even aside from issues involved in the criminal nature of the statute, no deference is due here.

By ignoring the narrow "intended only for use" standard, ATF may feel that the law will be easier to administer – the FTB can simply consult its checklist and disregard both the actual intent of any person and the dual uses of a product. However, "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington, Texas v. FCC*, 133 S. Ct. 1863, 1868 (2013); *id.* at 1874 ("Where Congress has established a clear line, the agency cannot go beyond it"). "We reaffirm the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2446 (2014).

Under *Chevron*, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 842. In the *Innovator* case, the court held that the FTB letter was not entitled to *Chevron* deference because it "contain[s] little more than conclusory assertions and head-scratching revelations about the process that FTB uses to classify silencers." 28 F. Supp.3d at 23. ATF failed (1) to "articulate a satisfactory explanation" for its

43

decision, and (2) to "examine the relevant data" before coming to a final conclusion.  *Id.* at 21, quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).[25]

Here, ATF also acted arbitrarily under another factor cited by *Motor Vehicle Mfrs. Ass'n* – it "offered an explanation for its decision that runs counter to the evidence before the agency . . . ." *Id.* at 43.

ATF's opinion here would not be entitled to *Chevron* deference in any event. *Christensen v. Harris County*, 529 U.S. 576, 580-81 (2000), held about a similar agency opinion on the law it administers as applied to certain facts as follows:

> Here . . . we confront an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking. Interpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference.

*Id.* at 587.

Although FTB opinions applying GCA and NFA definitions to specific firearms and devices are sometimes referred to as "classifications," that is an

---

[25]*And see Tripoli Rocketry Association, Inc. v. BATFE*, 437 F.3d 75, 76 (D.C. Cir. 2006) (setting aside ATF's classification of a certain propellant as an "explosive" because its explanation "lacks any coherence. We therefore owe no deference to ATF's purported expertise because we cannot discern it."); *Davis v. Erdmann*, 607 F.2d 917, 920 (10th Cir. 1979) (finding ATF firearm classification to be "a classic example of agency 'nitpicking,' and an arbitrary and capricious action," and deciding the case on the merits).

informal FTB term that is not provided by law or regulation.  Even where a statute authorizes "classification rulings," that does not entitle them to deference.  *United States v. Mead Corp.*, 533 U.S. 218, 230 (2001) ("a tariff classification has no claim to judicial deference under *Chevron*").  "On the face of the statute, . . . the terms of the congressional delegation give no indication that Congress meant to delegate authority to Customs to issue classification rulings with the force of law." *Id*. at 231-32.  Unlike the statute in *Mead*, here Congress delegated no authority to ATF even to issue classification rulings.

*F. J. Vollmer Co., Inc. v. Higgins*, 23 F.3d 448, 451-53 (D.C. Cir. 1994), agreed with a firearm manufacturer that its product was a semiautomatic rifle and rejected ATF's contention that it was a machinegun.  "The administrative record does not contain the reasoning behind the Bureau's interpretation," and ATF "made no findings of fact and offered no reasoned explanation on the subject," which would warrant setting its decision aside and remanding the matter.  *Id*. at 451.  However, violation of the statute was a crime and sufficient facts were known, and thus the manufacturer "is entitled to a decision on these questions now." *Id.*

Analyzing the statutory definitions and relying on an ATF order on how an item "can be removed from the firearm classification," the court found ATF's

45

position that the rifle was a machinegun to be "incredible," adding that even if uncertainty existed, "we must resolve the ambiguity in [the manufacturer's] favor . . . ." *Id*. at 452.[26]  So too here, ATF's position that a muzzle brake with multiple uses is "intended only for use" in a silencer is "incredible," and should any ambiguity exist, it must be resolved in Sig Sauer's favor.

This is not a case in which any suggestion of deference should arise in the first place.  Where the statute refers to something "intended only for" a certain use and the unchallenged facts establish intent for multiple uses, a court may not defer to an agency's insistence that such multiple uses must be ignored.  Here, ATF acknowledges Sig Sauer's intent to offer a muzzle brake that works; it ignores, and offers nothing to refute, Sig Sauer's further intent to offer a rifle with a barrel 16 inches in length with a design that avoids dangerously-high pressures.  The device at issue is clearly not a device "intended only for use" in assembly of a silencer.

### C.  The District Court Erred in Excusing ATF's Disregard of Sig Sauer's Intent to Market a Rifle with the Barrel/Muzzle Brake Length of 16 Inches in Order to Avoid Legal Restrictions

The district court concluded the oral argument in this case by expressing "significant concerns that the ATF . . . has not correctly interpreted the statute,"

---

[26]*See later proceedings, F. J. Vollmer Co., Inc. v. Magaw*, 102 F.3d 591, 593 (D.C. Cir. 1996) ("the agency's position was not substantially justified because it was wholly unsupported by the text, legislative history, and underlying policy of the governing statute.").

that "the deference that it is entitled to does not warrant the adoption of the ATF's interpretation," and that "ATF has not correctly applied Section 3[27] to the evidence in the case here and that therefore it acted arbitrarily in failing to sufficiently comment upon and assess the argument that . . . Sig Sauer made under Section 3." Trans. Mot. Hear., Add. 43-44.

However, in its opinion, the district court upheld ATF's decision that the device at issue is "intended only for use" in assembly or fabrication of a silencer, despite Sig Sauer's uncontradicted evidence of its intent that the device be used as a muzzle brake, that its length would ensure that the barrel is sixteen inches to avoid legal restrictions, and that the respective lengths of the rifled barrel and the device would ensure safe pressures.

The district court began by characterizing the device as "a silencer component known as a 'monolithic baffle core,'" Add. 2, but that begged the question of whether its dual use as a muzzle brake means that it is not "intended only for use" in a silencer, and thus is not a "silencer component."[28]

---

[27]Referring to the third definition of silencer in § 921(a)(24).

[28]Whether silencers are "particularly dangerous weapons," Add. 3 (citation omitted), cannot influence whether an item is a silencer as statutorily defined. *Cf. United States v. Ritsema*, 31 F.3d 559, 562 (7th Cir. 1994) ("although silencers are defined as 'firearms' . . ., they are not actual weapons."). Silencers may be lawfully possessed, and in any event "it is difficult to determine what exactly Congress was concerned about in deciding to regulate silencers at the federal level." *Innovator Enterprises*, 28 F. Supp.3d at 23, citing Paul A. Clark, "Criminal

At issue was whether ATF used the correct legal standard by applying an "objective test" to determine if the device "was intended only for use in a silencer" inconsistent with the subjective test set forth in *Crooker*. Add. 11. The district court assumed that "ATF's interpretation of the NFA[29] is entitled to deference only to the extent that it has the 'power to persuade.'" Add. 11 n.7, citing *Innovator Enters.*, 28 F. Supp.3d at 22 (applying *Skidmore* deference rather than *Chevron* deference).

The district court stated that "[a]gency actions are entitled to substantial deference under the arbitrary and capricious standard." Add. 14. Regardless of the deference, if any, due here under that standard, no deference is due when the reviewing court decides if agency action is "otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), on which Sig Sauer explicitly relied. Cf. Add. 14 n.10.

The district court held that "ATF acted rationally in concluding that Sig Sauer intended the baffle core to be used only as a silencer part" based on "substantial evidence in the record . . . ." Add. 15. No evidence, much less

---

Use of Firearm Silencers," *Western Criminology Review* 8(2), 44, 48 (2007), http://www.westerncriminology.org/documents/WCR/v08n2/clark.pdf. "The data indicates that use of silenced firearms in crime is a rare occurrence . . . ." Clark at 53.

[29]The definition of silencer is not in the NFA, but is in Chapter 44, Title 18.

substantial evidence, exists that Sig intended the device to be used "only" in a silencer. None of the four reasons given by the court support such exclusive use.

First, the district court noted that the same part can be used as a baffle core in a Sig Sauer silencer. Add. 15. But that is the capable-of-use test rejected by this Court in *Crooker*, 608 F.3d at 97-98. The part is just as capable of use only as a muzzle brake, and if marketed, that will be its *only* use other than for such purchasers who go through the legal process of obtaining a silencer. A product with dual uses is not "intended only" for one use.

Second, the district court stated that the device would be attached "to a pistol caliber rifle, which the ATF determined did not need a muzzle brake to function effectively." Add. 15; see App. 56. Even if valid, that does not mean that it is "intended only for use" in a silencer. Consumers buy all kinds of products that a government agency might think they do not "need," and ATF has no authority to base classifications on this factor Muzzle brakes on rifles are marketed in calibers far less powerful than the 9mm caliber Sig Sauer would use, including .22 caliber rimfire. EL Dec., App. 106-107 (see illustration). The Sig Sauer rifle does "need" this muzzle brake to achieve the 16 inch barrel requirement while maintaining safe pressures, and the video shows that it effectively reduces recoil and muzzle rise. EL Dec., App. 101-102, 104.

49

Third, the district court stated that unlike other muzzle brakes, the Sig device has expansion chambers and is larger. Add. 16. In fact, it has no expansion chambers since it has no outer cover, and its baffling system is designed the same as many other muzzle brakes. EL Dec., App. 104-105 & illustrations. Being larger allows it to reach the 16 inch barrel requirement.

Fourth, the district court stated that other muzzle brakes are no longer than 2-3 inches, which is sufficient to discharge the muzzle blast, making longer muzzle brakes "impractical." Add. 16; see App. 60-61. This again ignores the need for a 16 inch barrel. It further disregards that powder residue from the muzzle blast can be seen on the entire length of the device, proving its effectiveness. EL Dec., App. 101. There is nothing "impractical" about such a design, not to mention that ATF has no authority to mandate that firearm designs be "practical" in its view.

As the district court observed, "ATF failed to take note of the fact that the baffle core's length would allow Sig Sauer to market the rifle without special restrictions that are applicable to rifles with a barrel less than 16 inches." Add. 16 n.11. The court sought to excuse this by mistakenly stating that "Sig Sauer first raised this evidence in its September 18, 2014 request for reconsideration," and that "ATF's ruling is not arbitrary or capricious merely because it did not respond

to an argument made in the final stage of the process." *Id*. This is wrong for two reasons.

First, Sig Sauer expressed this intent in its *very first* submission to ATF dated April 4, 2013, which stated: "The sample brake is 9.5" and is permanently attached . . . to a 6.5" barrel to bring the barrel length to 16". . . . We believe the firearm as configured constitutes a Title 1 firearm with an integrated muzzle brake that does not require NFA registration . . . ." App. 20. "Title 1" of the Gun Control Act refers to 18 U.S.C. § 921 *et seq*., which applies to firearms in general. 82 Stat. 1213 (1968). The rifle with the muzzle brake would "not require NFA registration" in part because it had a 16" barrel. See 26 U.S.C. §§ 5841, 5845(a)(3) (requiring registration of rifle with barrel under 16 inches).

Second, ATF committed itself to considering information at the final stage of the process. After the complaint was filed, ATF sought and Sig Sauer agreed to a remand to allow ATF to issue "a revised decision," to which Sig Sauer could file a "Request for Reconsideration" with "additional information and documentation," after which ATF would "provide a written response to Sig Sauer's request." Parties' Joint Motion for Approval of Proposed Order to Stay Litigation Pending Reconsideration by the Defendant of Muzzle Device Classification, App. 40, 42-43. A proposed Order with identical language was included. App. 45-46. The

51

docket reflects: "Text of Order: Granted. So Ordered by Judge Paul J. Barbadoro."

Entry 6/9/2014, App. 4.

During the remand, Sig Sauer submitted extensive further information under the topic heading: "Intent to use the muzzle brake to increase barrel length to 16" or greater to avoid the short-barreled rifle category." App. 111-12; see also 97, 101-102. ATF's final decision stated: "Upon review of the submitted affidavits . . ., ATF's classification decision remains unchanged." App. 118.

In short, Sig Sauer's intent to use a long muzzle brake to keep the rifle barrel at the 16 inch minimum demonstrates that the device is not "intended only" to make a silencer. ATF's refusal to discuss or even acknowledge that intent demonstrates its failure to apply the statutory definition. The district court erred in sanctioning ATF's disregard for this central issue in the case based on it being raised too late, when it was an issue from the very beginning.

ATF's silence on this critical issue was not an expression of "expertise that is well within the ATF's grasp" entitling it to "substantial deference." Add. 16, citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). As *Marsh* admonished, courts must carefully review the record: "A contrary approach would not simply render judicial review generally meaningless, but would be contrary to

the demand that courts ensure that agency decisions are founded on a reasoned evaluation 'of the relevant factors.'" *Id*.

The district court decided that it does not matter that the device "will actually function as a muzzle brake," because ATF need not "conclude that a silencer part is intended to serve every function to which it could conceivably be put." Add. 16-17. Calling it a "silencer part" again begs the question of whether it is "intended only for use" in a silencer, which it is not. Not one iota of evidence exists for the assumption that Sig Sauer intends for consumers to purchase the product only for use in making a silencer and that consumers will not use it only as a muzzle brake.

Just because an actual silencer could be used as a "doorstop" does not make it "intended" for that purpose, Add. 17, but that is a false analogy if applied here, given that no one would buy it for that. As the district court told ATF at oral argument:

> If they tried to market a silencer as a doorstop, you could say to them, you're lying . . . . One, this doesn't function as a doorstop; two, it costs several hundred dollars to manufacture and a doorstop can be manufactured for five bucks; there's no viable market for the use of this as a doorstop, but it does function as a darn good silencer . . . .

Trans. Mot. Hear., Add. 28.

53

Finally, Sig Sauer initially used a longer handguard on the sample rifle it sent to ATF, and used a shorter handguard when it resubmitted the sample. EL Dec., App. 107-108.  Holding the longer handguard too far forward could have exposed one's hand to hot gases when the rifle was fired. ATF's insinuation that the longer handguard would have been appropriate if a silencer was mounted on the rifle was made *after* Sig Sauer sent the rifle with the shorter handguard to ATF. Sig Sauer explained that the shorter handguard was not available earlier.  *Id*.

Despite the above timeline, the district court found: "ATF was free to consider Sig Sauer's initial submission as evidence of its intended use even though Sig Sauer corrected this problem in the second prototype."  Add. 17.  To the contrary, ATF cannot simply close its eyes to the actual facts.

The district court concluded: "ATF was presented with conflicting evidence as to whether Sig Sauer intended the baffle core to be used only as a silencer." Add. 17.  In fact, *no* evidence exists that the device was "intended *only* for use" in a silencer.  To find otherwise robs the words "intended" and "only" of meaning, creates an adaptability test rejected by this Court in *Crooker*, and allows an agency simply to disregard facts at will.  Under any standard, deferential or not, ATF's decision was arbitrary, capricious, and otherwise not in accordance with law.

54

## CONCLUSION

This Court should hold that the device at issue is not a firearm silencer or firearm muffler in the meaning of 18 U.S.C. § 921(a)(24), and that ATF's decision that it is such was arbitrary, capricious, and otherwise not in accordance with law. Accordingly the judgment of the district court should be reversed.

Respectfully submitted,

Sig Sauer, Inc., Appellant

By counsel

Date: December 7, 2015

/s/ Stephen P. Halbrook
Stephen P. Halbrook
Suite 403
3925 Chain Bridge Road
Fairfax, VA 22030
(703) 352-7276
(703) 359-0938 (fax)
protell@aol.com

/s/ Mark C. Rouvalis
Mark C. Rouvalis, NH Bar No. 6565
Kenton J. Villano, NH Bar No. 21220
City Hall Plaza
900 Elm Street
Manchester, N.H. 03101
(603) 628-1329
(603) 625-5650 (fax)
mark.rouvalis@mclane.com
kenton.villano@mclane.com

Counsel for Sig Sauer, Inc.

CERTIFICATE OF SERVICE

I hereby certify that this brief and addendum were filed by the ECF system

and served on the following counsel of record electronically as a result thereof on

the 7th day of December, 2015:

Abby C. Wright
Seth R. Aframe
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530
abby.wright@usdoj.gov
seth.aframe@usdoj.gov

T. David Plourde
United States Attorney's Office
District of New Hampshire
53 Pleasant Street, 4th Floor
Concord, NH 03301
david.plourde@usdoj.gov

/s/ Kenton J. Villano
Kenton J. Villano

### CERTIFICATE OF COMPLIANCE
### WITH TYPE-VOLUME LIMITATION, TYPEFACE
### <u>REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

1.    This brief complies with the requirements of F.R.A.P. 32(a)(7)(B), because this brief contains 13,652 words.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word version 2010 in 14 point Times New Roman.

.

<u>/s/ Stephen P. Halbrook</u>
Stephen P. Halbrook

Date: December 7, 2015

**ADDENDUM**

# TABLE OF CONTENTS

**Addendum Page**

Judgment, September 24, 2015 ...................................................................1

Memorandum and Order, September 24, 2015........................................................2

ATF Letter, Oct. 2, 2014............................................................................19

Transcript of Motion Hearing Before the Honorable
Paul J. Barbadoro, July 17, 2015 (excerpts) .............................................................20

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Sig Sauer, Inc.

v.

Civil No. 14-cv-00147-PB

US Bureau of Alcohol, Tobacco, Firearms and Explosives,
Director

# **J U D G M E N T**

In accordance with the Order by Judge Paul Barbadoro dated September 24, 2015,

judgment is hereby entered.

By the Court,

Daniel J. Lynch
Clerk of Court

Date: September 24, 2015

cc:     Stephen P. Halbrook, Esq.
        Kenton James Villano, Esq.
        Mark C. Rouvalis, Esq.
        T. David Plourde, Esq.
        William Ryan, Esq.

1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Sig Sauer, Inc.</u>

    **v.**

<u>B. Todd Jones, Director,</u>
<u>Bureau of Alcohol, Tobacco,</u>
<u>Firearms and Explosives</u>

Case No. 14-cv-147-PB
Opinion No. 2015 DNH 184


<u>MEMORANDUM AND ORDER</u>


The National Firearms Act ("NFA") imposes strict
registration requirements and a special tax on anyone who makes,
sells, or possesses certain dangerous weapons such as machine
guns, short-barreled rifles and silencers. 26 U.S.C. §§ 5801-
72. Sig Sauer, Inc. plans to produce and sell a rifle with a
silencer component known as a "monolithic baffle core" that is
permanently affixed to the barrel of the rifle. It contends
that the baffle core is exempt from registration under the NFA
because it does not meet the statutory definition of a silencer.
The Bureau of Alcohol, Tobacco, and Firearms ("ATF") rejected
Sig Sauer's argument in an informal adjudicatory proceeding and
instead concluded that the baffle core should be treated as a
silencer under the NFA. 18 U.S.C. § 921(a)(24). The issue this
case presents is whether the AFT's determination was "arbitrary,
capricious, an abuse of discretion, or otherwise not in

2

accordance of law" under the Administrative Procedure Act

("APA"), 5 U.S.C. § 706(2)(A).


#### I.   BACKGROUND

#### A.   Statutory Framework

The NFA applies to "particularly dangerous weapons," United

States v. Posnjak, 457 F.2d 1110, 1113 (2d Cir. 1972), including

shotguns with barrels less than 18 inches in length, rifles with

barrels less than 16 inches in length, machineguns, silencers,

and destructive devices.  26 U.S.C. § 5845(a) (defining

"firearm" for purposes of the NFA).  The NFA sets "rigorous

registration and taxation requirements for the dealers and

transferors of those weapons."  Posnjak, 457 F.2d at 1113.  For

example, each NFA firearm must be registered in a central

federal registry and bear a serial number.  26 U.S.C. §§ 5841,

5842.  The NFA also imposes a $200 tax on the making of an NFA

firearm and on each subsequent transfer of the firearm.  26

U.S.C. §§ 5811, 5821; see Posnjak, 457 F.2d at 1114.  Violations

of the NFA are punishable by substantial fines and imprisonment

for up to ten years.  26 U.S.C. § 5871.

The NFA adopts the definition of the term "firearm

2

silencer" used in the Gun Control Act ("GCA").[1] 18 U.S.C. §
921(a)(24) (GCA definition of silencer); 26 U.S.C. § 5845(a)
(incorporating GCA definition by reference).  Under the GCA, a
firearm silencer is defined as:

> [A]ny device for silencing, muffling, or diminishing
> the report of a portable firearm, including any
> combination of parts, designed or redesigned, and
> intended for use in assembling or fabricating a
> firearm silencer or firearm muffler, and any part
> intended only for use in such assembly or fabrication.

18 U.S.C. § 921(a)(24).  This definition broadly encompasses
both completed silencers and parts that can be used to produce
silencers.  Any combination of parts that is intended to be used
to produce a silencer will be deemed to be a silencer under both
the NFA and the GCA, and a single part can qualify if it is
"intended only for use" in a silencer.

**B.    Sig Sauer's Classification Request**

On April 4, 2013, Sig Sauer submitted a prototype firearm
to the ATF and sought confirmation that the prototype would not

---

[1] The GCA imposes its own licensing requirements on
manufacturers, importers, and dealers of silencers.  See 18
U.S.C. §§ 921(a)(3)(C), 923.  In addition to silencers, the GCA
also applies to "any weapon . . . which will or is designed to
or may readily be converted to expel a projectile by the action
of an explosive."  18 U.S.C. § 921(a)(3)(A).  Accordingly, the
GCA will apply to the rifle Sig Sauer plans to manufacture
regardless of whether the baffle core is considered a silencer.

be subject to registration under the NFA.[2]  See A.R. 790.[3]  As proposed, the device combined a short-barreled rifle with a monolithic baffle core[4] that Sig Sauer uses in producing silencers. See A.R. 824. Sig Sauer explained in a letter submitted with the prototype that it intended the baffle core to serve as a muzzle brake[5] and not a silencer.  See A.R. 790 (doc. no. 15).  It also asserted that its prototype would not be subject to registration under the NFA as a short-barreled rifle because the combined length of the prototype's barrel and the

---

[2] The ATF encourages firearms manufacturers to submit devices for classification before they are offered for sale.  See Bureau of Alcohol, Tobacco, Firearms and Explosives, National Firearms Act Handbook 7.2.4 (2009), available at https://www.atf.gov/firearms/national-firearms-act-handbook.  It responds to classification requests with letter rulings that represent "the agency's official position concerning the status of the firearms under Federal firearms laws." Id. at 7.2.4.1. No statute or regulation requires either manufacturers to submit devices for classification or the ATF to issue classification letters.

[3]  The Administrative Record (doc. no. 15), filed conventionally with the court on November 3, 2014, is hereafter referred to as "A.R."

[4]  A monolithic baffle core is "an internal silencer part consisting of a series of integral expansion chambers, baffles, angled baffles, holes or slots designed to aid in diverting and capturing hot gases created by the burning of propellant powder. . . ." A.R. 818 (citation and internal punctuation omitted).

[5] A muzzle brake is a device affixed to the end of a firearm that redirects discharge gases to reduce recoil and unwanted muzzle rise.  See A.R. 816.

4

baffle core was 16 inches, the minimum barrel length that is sufficient to avoid classification as a short-barreled rifle. Id.

The ATF responded to Sig Sauer's request by noting that the baffle core was a silencer component and concluding, without further explanation, that it qualified as a silencer under the NFA because it was a part intended only for use in a silencer. See A.R. 791-93.

Sig Sauer followed up several months later with a request for reconsideration.  See A.R. 796-808.  In pressing its request, Sig Sauer reiterated its statement that it intended the baffle core to serve as a muzzle brake rather than a silencer. See A.R. 796.  It also submitted sound testing data for the prototype that showed that the baffle core did not reduce the sound of a firearm discharge when used without an outer tube. See A.R. 797.  Finally, Sig Sauer produced evidence supporting its claim that the baffle core functioned as a muzzle brake, and it identified several other devices that are manufactured and sold as muzzle brakes which, it argued, were similar to the baffle core. See A.R. 798.

The ATF responded with a one-page letter again stating without explanation that the baffle core was a "silencer" because it was "a part intended only for use in the assembly or

5

6

fabrication of a silencer." A.R. 809.

Sig Sauer filed its complaint in this court on April 7, 2014. On June 9, 2014, the parties filed a joint motion to stay the litigation to permit the ATF to reassess its determination that the baffle core qualified as a silencer under the NFA. Doc. No. 9. Shortly thereafter, Sig Sauer submitted a second version of the prototype that was substantially similar to the original prototype except that the hand guard on the barrel of the rifle was in a different position. See A.R. 822 (comparing the two prototypes).

Sig Sauer received a letter from the ATF on August 13, 2014 reaffirming its initial determination. A.R. 810-29. In explaining its position, the ATF dismissed Sig Sauer's sound testing evidence by explaining that a silencer part can qualify as a silencer regardless of whether, by itself, it reduces the sound of a firearm discharge. A.R. 813. The ATF addressed Sig Sauer's contention that it intended the baffle core to serve as a muzzle brake rather than a silencer by noting that although a manufacturer's statement of intention is relevant in determining whether a part is intended only for use in a silencer, it is not dispositive. A.R. 813-14. It then went on to consider other evidence that led it to conclude that the baffle core was intended only for use in a silencer. In particular, it noted

6

7

that the design features of the baffle core were indicative of
its use as a silencer component rather than as a muzzle brake.
For example, it concluded that the baffle core more closely
resembled a silencer part in size and dimension than a muzzle
brake. A.R. 818-21. Finally, the ATF responded to Sig Sauer's
contention that the baffle core must be treated as a muzzle
brake because it actually functioned as a muzzle brake by noting
that the mere fact that a part could incidentally serve a
particular function does not establish that it is intended to
serve that function. A.R. 824-25.

Sig Sauer responded to the ATF on September 18, 2014. See
A.R. 858. With that response, it submitted a declaration from
one of its design engineers explaining that Sig Sauer chose a
device that was longer than other muzzle brakes because the
longer muzzle brake was needed to bring the combined length of
the rifle barrel and the muzzle brake to 16 inches, which
prevented the rifle from being subject to registration under the
NFA as a short-barreled rifle. A.R. 859. The design engineer
also discussed testing that showed that the baffle core is an
effective muzzle brake. A.R. 866.

On October 2, 2014, the ATF reaffirmed its decision in a
one-page letter. A.R. 885. It stated that it "considered
numerous factors in classifying [Sig Sauer's] submission,

including [Sig Sauer's] purported intended use of the item."
Id. Nonetheless, it concluded that the part was a silencer
component and Sig Sauer's "alleged alternate use . . . does not
remove it from regulation under Federal law." Id.

Sig Sauer filed an amended complaint on October 6, 2014.
Doc. No. 11. The parties subsequently filed cross motions for
summary judgment. See Doc. Nos. 18, 19.


## II.    STANDARD OF REVIEW

Summary judgment is warranted when the record reveals "no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a). This standard was developed to provide parties with a
way to avoid the delay, expense, and uncertainty of a trial when
material facts are not in dispute. Because a court may not
engage in fact finding when it decides a summary judgment
motion, ambiguous evidence, even if it is undisputed, ordinarily
must be construed in favor of the nonmoving party. See Estrada
v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).

In administrative law cases, however, "[t]his rubric has a
special twist." Associated Fisheries of Me., Inc. v. Daley, 127
F.3d 104, 109 (1st Cir. 1997). If the decision will be based on
the administrative record, the issue before the court will

ordinarily be the legal question as to whether the agency's
action was "arbitrary, capricious, or otherwise contrary to
law." Id. In making this determination, an agency's factual
findings are entitled to deference regardless of which party has
moved for summary judgment. Thus, the usual rules that describe
how the court must construe the summary judgment record do not
apply. See Innovator Enters., Inc. v. Jones, 28 F.Supp.3d 14,
20 (D.D.C. 2014) ("[T]he standard set forth in Rule 56(a) does
not apply because of the limited role of a court in reviewing
the administrative record."). Instead, "[t]he entire case on
review is a question of law." Am. Bioscience, Inc. v. Thompson,
269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation
omitted); see also Univ. Med. Ctr. of S. Nev. v. Shalala, 173
F.3d 438, 440 n.3 (D.C. Cir. 1999) ("[T]he question [of] whether
[an agency] acted in an arbitrary and capricious manner is a
legal one which the district court can resolve on the agency
record . . . .").[6]

---

[6] The APA authorizes judicial review of "final agency action."
5 U.S.C. § 704. Informal adjudication can qualify as final
agency action if the agency has completed its decision making
and no other adequate judicial remedy exists. Butte Cnty v.
Hogan, 613 F.3d 190, 194 (D.C. Cir. 2010). In the present case,
the parties agree that the ATF's classification ruling is final
agency action reviewable under the APA. Tr. at 11-12 (Doc. No.
31).

###                    III.    **ANALYSIS**

Sig Sauer claims that the ATF made an egregious error when it concluded that the baffle core is subject to the NFA as a silencer.  Although Sig Sauer's arguments are somewhat difficult to disentangle, it appears to claim both that the ATF used an incorrect legal standard in making its decision and that it acted arbitrarily even if it used the correct standard.  Because the standards of review that govern these two arguments differ, I deal with them separately.

### A.    **Did the ATF Base its Classification Ruling on Correct Legal Standard?**

Sig Sauer first argues that the ATF incorrectly used a purely objective test to determine whether the baffle core was intended only for use in a silencer, rather than the subjective test mandated by the First Circuit's decision in United States v. Crooker, 608 F.3d 94, 97 (1st Cir. 2010).[7]

In Crooker, the First Circuit considered whether a silencer designed for an air gun was a firearm silencer under the GCA because it was a "device for silencing" a firearm.  Id. at 96-97.  As I have explained, the applicable definition includes

---

[7]  In responding to this argument, I assume for purposes of analysis that the ATF's interpretation of the NFA is entitled to deference only to the extent that it has the "power to persuade."  See, e.g., Innovator Enters., Inc. v. Jones, 28 F.Supp.3d 14, 22 (D.D.C. 2014) (applying Skidmore deference rather than Chevron deference to a classification ruling).

10

"any device for silencing" a firearm, any combination of parts
"intended for use" in assembling a silencer, and any part
"intended only for use" in a silencer.  18 U.S.C. § 921(a)(24).
Although "a device for silencing" does not use the word
"intended" - as the other two parts of the definition do - the
First Circuit nonetheless held that the government was required
to show that the defendant, who had directed the creation of the
home-made device, "had a purpose to have the device function as
a firearm silencer."  Id. at 99.  In reaching this
determination, the court commented on the tripartite structure
of the silencer definition and suggested that "it is as easy
(perhaps easier) to view all three tests as gradations of
purpose made more rigorous as the statute extends from a self-
sufficient device to a collection of parts to a single part."
Id. at 97.  Thus, the court embraced a subjective test when
construing the silencer definition, where the subjective intent
requirement applies most "rigorously" to single silencer parts.

Sig Sauer argues that the ATF's classification decision is
incompatible with Crooker because the agency allegedly used a
purely objective test to determine whether the baffle core was
intended only for use in a silencer.  Because I conclude that
the ATF applied the proper subjective intent test, I disagree.
In reaching its decision, the ATF stated that "[w]hen

11

12

classifying a part as a firearm silencer, the statute imposes an intent requirement. Therefore, the manufacturer's stated intent for the part is clearly relevant." A.R. 814. Although it also noted that "the objective design features of the part must support the stated intent," id., ATF did so merely to explain why it was not obligated to defer to a manufacturer's statement of intention when that statement is contradicted by objective evidence. If, as Sig Sauer argues, the ATF had used a purely objective test to classify the baffle core, it would have had no reason to consider Sig Sauer's subjective intentions because the agency's classification decision would necessarily turn on purely objective factors. In contrast, the fact that the ATF looked to objective evidence when evaluating Sig Sauer's statement of intention does not mean that it was using an objective test because objective evidence is always relevant in determining whether to accept a statement of subjective intention.[8] Accordingly, I am unpersuaded by Sig Sauer's claim

---

[8] By considering objective evidence when reviewing a manufacturer's stated intent, ATF legitimately sought to avoid the "absurd result" of "[f]ederal regulation of only those firearms silencer parts that the manufacturer wanted to market as such, while leaving other firearm silencer parts completely unregulated." A.R. 814. By looking exclusively to subjective evidence, a manufacturer could, for example, "market silencers as 'flash hiders' or other devices simply by claiming that . . . they are not intended only to diminish the report of a portable firearm." Id.

that the classification ruling was inappropriately based on a
purely objective test.[9]

## B.  <u>Was the Classification Ruling Arbitrary or Capricious?</u>

Sig Sauer also argues that the ATF's classification ruling,
that Sig Sauer intended the baffle core only as a silencer part,
was arbitrary and capricious even if it was based on a
permissible construction of the NFA.

Agency actions are entitled to substantial deference under
the arbitrary and capricious standard.[10]  Although an agency
decision will be deemed to be arbitrary and capricious if "the
agency has relied on factors which Congress has not intended it
to consider, entirely failed to consider an important aspect of
the problem, offered an explanation for its decision that runs
counter to the evidence before the agency, or is so implausible

---

[9] To bolster its statutory interpretation argument, Sig Sauer
invokes the rule of lenity, a rule of statutory interpretation
that requires courts to resolve ambiguities in criminal
statutes, like the NFA, in the defendant's favor. See United
States v. Thompson/Center Arms Co., 504 U.S. 505, 517–18 (1992);
Doc. No. 19-1, at 18-23. Sig Sauer seemingly argues here that
the rule of lenity demands that I read the NFA's "intended only
for" language to create a subjective intent test. Id. at 22.
Because I conclude that the ATF in fact used a subjective test,
I need not determine whether such a test is required by the rule
of lenity.

[10] Sig Sauer agreed, at oral argument, that ATF's action here is
subject to arbitrary and capricious review. Tr. at 12-13 (Doc.
No. 31).

13

that it could not be ascribed to a difference in view or the product of agency expertise," a reviewing court may not "substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Instead, if the agency has properly considered the problem, its decision must be upheld if it is "supported by any rational view of the record." Atieh v. Riordan, No. 14-1947, 2015 WL 4855786, at *2 (1st Cir. Aug. 14, 2015).

In the present case, the ATF acted rationally in concluding that Sig Sauer intended the baffle core to be used only as a silencer part because the agency pointed to substantial evidence in the record to support its determination. First, it is undisputed that the baffle core is an essential silencer component. Tr. at 55-56 (Doc. No. 31). It is, in fact, identical in design and dimension to the baffle core contained inside a removable Sig Sauer silencer. A.R. 824; see also Tr. at 55-56 (Sig Sauer's counsel conceding that Sig Sauer has "basically taken the cap off [its] silencer . . . welded it into the gun, and [marketed the baffle core] as a muzzle brake"). Second, Sig Sauer proposed to attach the baffle core to a pistol caliber rifle, which the ATF determined did not need a muzzle brake to function effectively. A.R. 818. Third, the ATF

14

15

examined other muzzle brakes on the market and concluded that
the baffle core was unlike other conventional muzzle brakes
because it included expansion chambers and was considerably
larger than the muzzle brakes that are already available for
sale.  A.R. 818-21.  Finally, it noted that muzzle brakes are
designed to be no larger than two to three inches, which is
considerably shorter than the baffle core, because a muzzle
blast discharges after two to three inches, making longer muzzle
brakes impractical.[11]  A.R. 822-23.  All of these observations
require expertise that is well within the ATF's grasp.  Thus,
its conclusions are entitled to substantial deference from a
reviewing court.  Marsh v. Or. Natural Res. Council, 490 U.S.
360, 378 (1989).

Sig Sauer also argues that the ATF arbitrarily failed to
credit its test data, which shows that the baffle core will
actually function as a muzzle brake.  This argument misses the
mark because the ATF is not obligated to conclude that a

---

[11] Sig Sauer complains that the ATF failed to take note of the
fact that the baffle core's length would allow Sig Sauer to
market the rifle without special restrictions that are
applicable to rifles with a barrel less than 16 inches.  See
A.R. 873 (citing 18 U.S.C. § 921(a)(8), 26 U.S.C. § 5845(a)(3)).
However, Sig Sauer first raised this evidence in its September
18, 2014 request for reconsideration, after ATF had issued three
letters to Sig Sauer.  A.R. 869-70.  Despite Sig Sauer's
contrary contention, the ATF's ruling is not arbitrary or
capricious merely because it did not respond to an argument made
in the final stage of the process.

silencer part is intended to serve every function to which it could conceivably be put.  As the ATF noted, the baffle core is a heavy part that probably could function as a doorstop, but that does not mean that it is intended to serve that purpose. A.R. 814.[12]

Finally, Sig Sauer faults the ATF for inferring that Sig Sauer did not intend the baffle core to serve as a muzzle brake in part because its first prototype had a handguard placed in such a way that would make the muzzle core unusable as a muzzle brake because it would have "redirect[ed] hot gases onto the shooter's hand each time a projectile was fired."  A.R. 822. Although Sig Sauer argues that ATF should have examined only its second prototype – in which the hand guard did not cover any part of the device – the ATF was free to consider Sig Sauer's initial submission as evidence of its intended use even though Sig Sauer corrected this problem in the second prototype.

In summary, the ATF was presented with conflicting evidence as to whether Sig Sauer intended the baffle core to be used only as a silencer.  It considered the relevant evidence using the

---

[12]  Sig Sauer also complains that the ATF failed to account for sound testing data which shows that the baffle core does not, by itself reduce the sound of a firearm discharge.  The ATF met this contention by noting that whether a silencer part reduces the sound of a firearm discharge by itself is not determinative of whether it can be classified as a silencer.  A.R. 824.

correct legal standard and came to a rational conclusion based upon its expertise.  No more is required to sustain its decision.

### IV.    CONCLUSION

The ATF's classification of Sig Sauer's device as a firearm silencer was not "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Accordingly, I grant ATF's motion for summary judgment (doc. no. 18), and I deny Sig Sauer's motion for summary judgment (doc. no. 19).  The clerk shall enter judgment accordingly and close the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

September 24, 2015

cc:   Stephen P. Halbrook, Esq.
      Kenton James Villano, Esq.
      Mark C. Rouvalis, Esq.
      T. David Plourde, Esq.
      William Ryan, Esq.

17



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_Martinsburg, WV 25405_

www.atf.gov

OCT 0 2 2014

903050:ELG
3311/302424

Mr. Steven Shawver
Vice President and Chief Legal Officer
Sig Sauer, Inc.
10 Industrial Dr
Exeter, NH 03833-4557

Dear Mr. Shawver,

This refers to your recent submission, received by this office on September 22, 2014 consisting of your written declaration and both a written and video declaration of Mr. Ethan Lessard, all dated September 18, 2014.

As stated in our previous classification letters, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) considered numerous factors in classifying your submission, including your purported intended use of the item. However, the submitted sample is, by design and construction, a part well-known in the firearms community as a "monolithic baffle stack," a silencer component. The alleged alternate use of a silencer component does not remove it from regulation under Federal law, especially where, as here, such removal would undermine the statute's very purpose of regulating all individual silencer components.

Upon review of the submitted affidavits dated September 18, 2014, ATF's classification decision remains unchanged. The submitted sample is a "_firearm silencer_" pursuant to 18 U.S.C. 921(a)(24) and 26 U.S.C. 5845(a)(7).

Sincerely yours,

Earl Griffith
Acting Chief, Firearms and Ammunition Technology Division

19

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
　　　　　　　　　　　　　　　　　　　　　\*
SIG SAUER, INC.,　　　　　　　　　　　　\*
　　　　　　　Plaintiff,　　　　\*　14-cv-147-PB
　　　　　　　　　　　　　　　　　　\*　July 17, 2015
　　　　　　　v.　　　　　　　　\*　2:10  p.m.
　　　　　　　　　　　　　　　　　　\*
THOMAS E. BANDON, Acting　　　　　\*
Director, Bureau of Alcohol,　　\*
Tobacco, Firearms and　　　　　　\*
Explosives,　　　　　　　　　　　　\*
　　　　　　　Defendant.　　　　\*
　　　　　　　　　　　　　　　　　　\*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For the Plaintiff:　　Stephen P. Halbrook, Esq.
　　　　　　　　　　　　　Halbrook Law Office
　　　　　　　　　　　　　3925 Chain Bridge Road, Ste. 403
　　　　　　　　　　　　　Fairfax, VA  22030

　　　　　　　　　　　　　Mark C. Rouvalis, Esq.
　　　　　　　　　　　　　Kenton James Villano, Esq.
　　　　　　　　　　　　　McLane Graf Raulerson & Middleton
　　　　　　　　　　　　　900 Elm Street
　　　　　　　　　　　　　Manchester, NH  03105-0326

For the Defendant:　　T. David Plourde, AUSA
　　　　　　　　　　　　　U.S. Attorney's Office (NH)
　　　　　　　　　　　　　Concord, NH  03301

　　　　　　　　　　　　　William Ryan, SAUSA
　　　　　　　　　　　　　Bureau of Alcohol, Tobacco,
　　　　　　　　　　　　　Firearms & Explosives
　　　　　　　　　　　　　Office of Chief Counsel
　　　　　　　　　　　　　Martinsburg, WV  25405

Court Reporter:　　　　Sandra L. Bailey, LCR, CRR
　　　　　　　　　　　　　Official Court Reporter
　　　　　　　　　　　　　U.S.D.C. 55 Pleasant Street
　　　　　　　　　　　　　Concord, NH 03301
　　　　　　　　　　　　　(603) 225-1454

10

```
1              MR. RYAN:  That's right, sir.
2              THE COURT:  Okay.  So, if I am to infer that
3    Congress intended you to interpret this statute in a way
4    that would have force of law, it comes from the general
5    authority granted to the Department of Justice to
6    implement the statute.
7              MR. RYAN:  Yes, sir, specifically it would be
8    impossible to implement the statute without knowing
9    which of these things is a firearm.
10             THE COURT:  And -- well, right, but the
11   Executive Branch does a whole lot of things every single
12   day without creating law as to how a statute is
13   implemented, and many of those things, in fact most of
14   those things are reviewed by the court de novo, or
15   they're reviewed by the court and the court, the
16   Department of Justice makes its position clear to me.
17   Every time I have a criminal prosecution, they don't
18   produce a letter from the director of ATF and say this
19   is what the statute means, you are bound by law to
20   follow the director of ATF's interpretation of this.
21   They say, judge, we want you to adopt this
22   interpretation.  And I either adopt it or I don't.
23             That's normally the way statutes are
24   interpreted in our legal system.
25             MR. RYAN:  Yes, sir.
```

```
 1   provision, you can qualify as a silencer if it's
 2   intended for use in assembling or fabricating a
 3   silencer, even if it's also intended for use in
 4   manufacturing a muzzle brake.  So, if you have a dual
 5   use assembly of parts that is intended for both
 6   purposes, you can regulate as a silencer; right?
 7            MR. RYAN:  That's right, sir.
 8            THE COURT:  But if you have a part -- if you
 9   have a part that is intended -- that is used in
10   assembling a silencer, you can treat that part as a
11   silencer.  The only case when you can't is if it is
12   intended only for use in a silencer; right?
13            MR. RYAN:  Understand, yes, sir.
14            THE COURT:  So if the part can be -- is
15   intended for more than use as a silencer, it's intended
16   for use as a silencer, but it's also intended for use as
17   a muzzle brake, it's not a silencer.
18            MR. RYAN:  Understand that, sir.
19            THE COURT:  You agree?
20            MR. RYAN:  Yes, sir.
21            THE COURT:  Okay.  Because you've chosen to
22   rely on only the third section, your decision stands or
23   falls on whether your decision that this was a part
24   intended only for use in the fabrication of a silencer
25   was arbitrary, capricious or otherwise not in accordance
```

34

```
 1    with the law?
 2              MR. RYAN:  That's correct.
 3              THE COURT:  You agree with all that?
 4              MR. RYAN:  Yes, sir.
 5              THE COURT:  I really appreciate your frankness
 6    in answering your question.  It makes your case much
 7    more difficult for you, but I appreciate your answer.
 8              Let me ask you this.  So, I'll be frank with
 9    you.  The two concerns I have with your case, that's one
10    of them, that I don't see you in any of your materials
11    in any way responding to their suggestion that this is
12    intended for use only as a silencer.  I see you making a
13    case for what I call objective intent as the appropriate
14    standard, and I think that's what you're relying on, and
15    I think we can talk about that, whether that standard
16    should be, how much deference should be given to your
17    view on that point, but, so, but the second argument is
18    independent of that.
19              Assume that you're right, that we use
20    objective intent, okay, objectively intended only if it
21    subjectively is intended for both and if it objectively
22    can be used for both, would you agree that the standard
23    is not met?
24              MR. RYAN:  I'm sorry, sir.
25              THE COURT:  You have trouble following me?
```

1          MR. RYAN:  Well, that's what all the testing

2    was about, sir, and what we talked about --

3          THE COURT:  I know, but did you say in there

4    it doesn't function as a muzzle brake.  We looked at it

5    and it doesn't serve to be a brake.

6          MR. RYAN:  No, your Honor, because all

7    monolithic baffle stats will function that way.

8          THE COURT:  That's right, that's the problem.

9    It's a loophole in the statute.  Believe me, it looks

10   like a loophole in the statute, but it's a loophole

11   that's rational and reasonable and not insane.  It's a

12   loophole that exists because Congress was concerned

13   about we don't want to ban dual use items.  We want to

14   have the ability to sell dual use items unless they are

15   an assembly of its intended for use as a silencer.  And

16   that's a highly rational way that Congress might want to

17   address this issue.  It isn't necessarily the way I

18   would have addressed it, but if it's a rational way that

19   they addressed it, you've got to address it in your

20   answer.  And in order not to be arbitrary and

21   capricious, you've got to engage with them on that

22   central point.

23          Now, if you said in your response, we've

24   tested this and it doesn't function as a muzzle brake,

25   therefore, it can't be intended to be a muzzle brake,

1    you'd have no trouble if the evidence supported that.

2    Or if you had said, we don't think this is objectively

3    intended to function as a muzzle brake because we looked

4    at all the muzzle brakes on the market and yours is so

5    much less effective than all of those that you couldn't

6    possibly gain any market share by selling this,

7    therefore, you couldn't objectively intend to sell this

8    as a muzzle brake.  You'd be okay if the evidence

9    supported you in that.  But you didn't say anything

10   about it.

11            MR. RYAN:  The problem is, your Honor, I think

12   that nothing would be a silencer, the law would be

13   rendered moot --

14            THE COURT:  No, you know, that's a nice

15   argument but it's completely factually wrong, because

16   every assembly, every actual silencer, if it's

17   objectively intended to be a silencer, is a silencer,

18   okay?  Wait, let me finish.  And every assembly of parts

19   that's intended to be -- objectively intended to be a

20   silencer, would be a silencer.  So you could regulate

21   all kinds of silencers by giving this language its

22   ordinary meaning.

23            And let me be clear.  You have an argument

24   about how to interpret the statute on intended, but you

25   haven't presented any argument that the third prong of

40

```
 1    the statute, when it says only, doesn't mean only.  If
 2    you're making the argument that it doesn't mean only
 3    because it would be absurd for it to mean only, tell me
 4    what --
 5              MR. RYAN:  The third part of that statute
 6    would be rendered meaningless, your Honor, and I didn't
 7    mean to suggest the whole thing, the third part, the
 8    part intended only clause.
 9              THE COURT:  No, it wouldn't be, it would be
10    narrowed, but it would be -- see, because when -- and I
11    understand, you guys have a laser like focus on trying
12    to keep firearms from getting into the wrong hands,
13    regulating them appropriately, and I understand that,
14    and that's a very important function that you are
15    serving, but what did Congress mean when it inserted the
16    word only in that third provision?  You tell me.
17              MR. RYAN:  Well, I believe that they wanted to
18    avoid having things like a coke bottle, for example, or
19    some other legitimate item that you point out be
20    regulated as a silencer all by itself.
21              THE COURT:  Okay.
22              MR. RYAN:  What's happened here is the
23    plaintiff has taken that whole dynamic and flipped it
24    around.  What they've done is they've taken something
25    that they developed as a silencer and sold as a
```

1    they are identical part numbers, because this was simply

2    taken off the shelf, one was called a silencer, one was

3    called a muzzle brake, and they were sent to ATF.  That

4    is in the classification letter.

5          THE COURT:  Right, but you don't conclude --

6    see, one thing you could say here, you could have said

7    is exactly that, this is not intended to function as a

8    muzzle brake.  It's intended to function as a silencer,

9    and I know you claim otherwise, but we don't believe

10   you, and here's the evidence to support our conclusion

11   that you are wrong about this, either mistaken or lying

12   or whatever.  You're trying to -- you're intending this

13   to be sold as a silencer.  And that would be a piece of

14   evidence that you would want to point to.

15          But you agree, that's not what you did.  You

16   did not in any way say to them, we find that you are not

17   intending to market this as a muzzle brake.  What you

18   said to them was intent is relevant, but what's relevant

19   is objective intent.  And that argument is a legitimate

20   argument that we can talk about, but it doesn't address

21   this other problem, which is only means only, and it's

22   not enough for you to say it's intended to be sold as a

23   silencer.  You have to show it's intended -- it should

24   be used only as a silencer.

25          Now, your point that that third provision

46

1   as a doorstop, okay, it's not a doorstop, it's a

2   silencer.  We don't believe you.  That's what you need

3   -- I know it's uncomfortable to say that, but I say that

4   to people all the time.  They get up and say things to

5   me and I just say, sorry, you're not telling me the

6   truth.  And that's what you have to do.  You can say to

7   Sig Sauer, you're lying.  If they tried to market a

8   silencer as a doorstop, you could say to them, you're

9   lying, you're not intending to market this as a

10  doorstop, and I can tell you why you're lying.  The

11  following circumstances lead me to conclude that you're

12  lying.  One, this doesn't function as a doorstop; two,

13  it costs several hundred dollars to manufacture and a

14  doorstop can be manufactured for five bucks; there's no

15  viable market for the use of this as a doorstop, but it

16  does function as a darn good silencer, which is the

17  field you're engaged in, and you could say to them on

18  the basis of that this is not a doorstop.  It's a

19  silencer.  And you're intending to use it as a silencer.

20  And you're intending it only to be used as a silencer.

21  And if you said that, any court would have to defer to

22  your expertise if you were at all -- if it was all

23  supportable by the evidence.

24          But that's not what you chose to do.  You

25  chose to treat this as if -- we're not saying you're not

28

1  think that in the Crooker case they actually talked

2  about what would happen when -- for example, in that

3  case it was a homemade silencer.  What they later on

4  said was that if there's a commercially designed

5  silencer, you wouldn't have to show all these other

6  things about what its intended use or not, because

7  people know it's commercial and that's what it is, all

8  right, that's what it is.

9         THE COURT:  You're trying to argue the same

10  standard that you argued in Crooker essentially, because

11  if it functions as a silencer, it's objectively intended

12  to be a silencer.  I thought that's what you're saying,

13  isn't it?  If it functions as a silencer, it's

14  objectively intended to be a silencer, because people

15  are deemed to know that which follows inevitably from

16  their actions, that's the case.  Have you looked at any

17  case -- we're now straying into the other issue.  Let's

18  get back to the one that matters here now.

19         I am asking you right now, tell me what the

20  third, how the third prong of the statute, statutory

21  definition of silencer, applies in a case in which a

22  manufacturer produces a part that can be used both for a

23  silencer and for a muzzle brake if the evidence supports

24  the view that the manufacturer intended it to be used as

25  a muzzle brake.  How does that fit under the third prong

 1   of that statute?

 2           MR. RYAN:  If the evidence supports the view,

 3   sir, that's not this case.

 4           THE COURT:  Well, I'm trying to simplify it to

 5   get an answer out of you, so that's why I'm asking the

 6   hypothetical.  So follow with me, okay?

 7           MR. RYAN:  Yes, sir.

 8           THE COURT:  The evidence in the case is

 9   absolutely clear that the manufacturer intends this to

10   be used and marketed in two ways.  One, as a muzzle

11   brake if sold alone and operated without the benefit of

12   the cover.  And two, as a silencer for people that want

13   to put a cover on it.  Okay?  Let's just say they intend

14   to do it that way.  Let's assume the muzzle brake is a

15   part and not an assembly, okay?  And we're only

16   construing the third part of that statute, okay?  Now,

17   let's assume that you have evidence that the

18   manufacturer is intending to do both of those things,

19   okay?  Let's assume you do testing and the testing shows

20   it can do both of those things, okay?  Is that a part

21   intended only for use in an assembly or fabrication of a

22   silencer?

23           MR. RYAN:  No, your Honor.

24           THE COURT:  Okay.  How is this case different

25   from that?

1    not function as a muzzle brake?

2              MR. RYAN:  Anywhere that it -- I'm sorry,

3    could you say that again, sir.

4              THE COURT:  They asked for classification.

5    You've responded; right?

6              MR. RYAN:  Yes, sir.

7              THE COURT:  Does your initial response say in

8    any way that this part is a silencer because it does not

9    function as a muzzle brake?

10             MR. RYAN:  No, your Honor.

11             THE COURT:  Does any of your subsequent

12   responses to their request for reconsideration say, in

13   any way, that this -- that this part does not function

14   as a muzzle brake?

15             MR. RYAN:  No, your Honor.

16             THE COURT:  All right.  So, there's no

17   evidence -- there's no evidence, or at least you did not

18   explain your decision in any way, by concluding that

19   this did not function as a muzzle brake.  Do you agree?

20             MR. RYAN:  Only that all of these items

21   function as muzzle brakes.  Silencers function as muzzle

22   brakes.

23             THE COURT:  So your theory is that every part

24   -- that every part like this will function as a muzzle

25   brake, and every part like this is a necessary component

1    THE COURT:  You should explain why it doesn't

2  function as a muzzle brake or isn't intended to be sold

3  as a muzzle brake.  Why are you concluding that this is

4  not intended to be, intended for use in the assembly of

5  a muzzle brake?  Why are you concluding that this part

6  is not intended for use in the assembly of a muzzle

7  brake?

8    MR. RYAN:  For example, all of the -- all of

9  the characteristics of the item.  For example, your

10  Honor, the shoulder, the screw on the end of it, all of

11  these things are unnecessary.  What it really is and

12  what ATF did was looked at the item and said we

13  understand the argument, but what they've really done

14  here is taken a silencer and trying to give it another

15  name.  And it wasn't arbitrary and capricious for ATF to

16  say that.  It actually went in and tested like items and

17  actual muzzle brakes.

18    THE COURT:  I wish you had said that, it would

19  be an easier case.  If you said to them, you know,

20  you're lying, it's not intended to be used as a muzzle

21  brake, it would be an easier case, because then the sole

22  issue would be was your factual conclusion arbitrary and

23  capricious.  But, you never even addressed their

24  argument that it -- they concede it's a dual use item, I

25  think, they concede that with an additional part it

1   could be a silencer.  So it has potentially a dual use.

2   But they have consistently maintained they're intending

3   subjectively to market it as a muzzle brake, and they

4   have consistently maintained that it functions as a

5   muzzle brake, and they have consistently maintained that

6   even if you think it can be adapted to be used as a

7   silencer, it can be and is being intended to be sold as

8   a muzzle brake.  And under the statute, it's entitled to

9   be treated as a muzzle brake under that circumstance if

10  it's a part rather than an assembly.  That's I think

11  their position, and I don't think you ever responded to

12  that argument.

13          MR. RYAN:  Well, your Honor, it's true that

14  ATF never said you're lying.  They didn't say that.

15  However, ATF did provide, for example, on page 14 of the

16  original or the final classification, an example of the

17  blast that comes out when this thing is fired and where

18  the hand would have to be held, and it shows that the

19  blast would cover the hand.  It would be completely

20  worthless to use it like that.

21          It also points out the same numbers.  What

22  you've done is you've just taken this off the shelf,

23  it's the same number, took a picture of them together to

24  show they are exactly the same.  All right?  ATF never

25  said yes --

1    ban them.  I think that's what they are saying.  And

2    what these guys have done is they're taken something

3    that you're prepared to treat as a part and they're

4    going to slide in under the part exception, because it

5    functions as a muzzle brake.  You want to stop them.  I

6    understand why you want to stop them.  But you can't

7    stop them unless you do it by law, so, and the problem

8    with only is you need to then engage with them on the

9    only argument.  So you have to then, in order for your

10   decision not to be arbitrary and capricious, you can't

11   just ignore their argument.  You can't just pretend it

12   doesn't exist and in your answer explain to them why

13   it's a silencer.  I can't find any point in there in

14   which you ever explain to them that this is why it's

15   intended only to be used as a muzzle brake, even though

16   you claim otherwise, and even though you submitted

17   evidence that it functions as a muzzle brake.

18           I understand your point.  Your point is that

19   every silencer will function as a muzzle brake,

20   therefore, this loophole will allow anybody who has a

21   part, that has this essential component of a silencer in

22   it, will be able to claim it's a muzzle brake.  I

23   understand the problem, but I don't see how it fits

24   within the statute.

25           MR. RYAN:  But, your Honor, the point I was

 1    You're wasting my time here because you're just

 2    spinning, and I can't even get any purchase on what

 3    you're saying.

 4            MR. RYAN:  It's that they've simply broken

 5    down this one combination of parts.  Sig has it.  It's

 6    one design.  It's not something that someone has to come

 7    up with --

 8            THE COURT:  But your argument is -- you're

 9    frustrating me now because you're just getting almost

10    incoherent.

11            As I understand your argument, it is, judge,

12    even if this extrusion is a single part, the sale of the

13    extrusion is the sale of an assembly of parts under two,

14    and the reason it is is because it can be combined with

15    other parts to make a silencer.

16            Is that or is that not what you're saying?

17            MR. RYAN:  No, your Honor.

18            THE COURT:  Is the extrusion a part or is the

19    extrusion parts, just the extrusion?

20            MR. RYAN:  The core, sir, is that what you're

21    talking about?

22            THE COURT:  You give me the label that you're

23    comfortable with, okay?  What label are you comfortable

24    with?  Let's call it the core, all right?

25            MR. RYAN:  Yes.

76

```
 1              THE COURT:  Is the core a part or is it
 2   multiple parts?
 3              MR. RYAN:  It's a part that is part of a
 4   combination of parts.
 5              THE COURT:  Is it a part or multiple parts?
 6              MR. RYAN:  It's a part, sir.
 7              THE COURT:  Where are the other parts that
 8   they're trying to market and sell with this item?  What
 9   other parts are they marketing and selling with this
10   item that constitute a silencer?
11              MR. RYAN:  The screw at the end and the outer
12   tube.
13              THE COURT:  Are they selling the screw at the
14   end and the outer tube with this product?
15              MR. RYAN:  They have them available, sir, and
16   so for example --
17              THE COURT:  Okay, I'm done with that.  I don't
18   want to hear anymore of that argument.  You've made it.
19   Just move on, okay?
20              Look, you were doing so well the first part of
21   your argument, then you just start making stuff up.
22   That's not an acceptable approach.  Okay?
23              Counsel, here's the thing that they said that
24   was most important to me.  They base their only argument
25   on evidence that suggests that if you try to operate
```

```
 1              THE COURT:  There's nothing that suggests that
 2   Congress specifically intended you to resolve statutory
 3   construction problems on the meaning of intent.
 4              MR. RYAN:  That's right, not on the meaning of
 5   intent, sir.
 6              THE COURT:  Okay.  You didn't put this out for
 7   notice and comment, you didn't solicit public views
 8   about it.
 9              MR. RYAN:  That's correct.
10              THE COURT:  You issued it in connection with a
11   letter.  You didn't engage in any kind of formal process
12   in which anybody other than Sig Sauer was entitled to
13   offer input.
14              MR. RYAN:  That's right, no official hearing
15   or anything like that, sir.
16              THE COURT:  And your view is now everybody,
17   all courts in the United States, including the Supreme
18   Court of the United States, must accept your view based
19   on that ruling, that this is objective intent.
20              MR. RYAN:  Not as to the -- only as to the
21   firearm and the objective characteristic and ATF's
22   classification of it, sir, and so when I talk about --
23              THE COURT:  No, but in terms of intended, what
24   the meaning of the word intended is, you believe that
25   you have the authority to construe that to mean
```

95

```
1    objectively intended.  You believe that interpretation
2    you're giving has to be followed by all courts of the
3    United States, including the Supreme Court of the United
4    States, everybody must agree with you that intended in
5    that statute means objectively intended.
6              MR. RYAN:  I think that's a difficult position
7    to take, sir.
8              THE COURT:  But that's what you mean.
9              MR. RYAN:  Well, but --
10             THE COURT:  Crooker I have to ignore.  Your
11   position is, even though the First Circuit is above me
12   and even though the First Circuit in Crooker said
13   subjective intent governs in a 921 issue as to what a
14   silencer is, you say I must disregard Crooker.
15             MR. RYAN:  No, sir, not at all.
16             THE COURT:  How can I reconcile your
17   interpretation with Crooker?
18             MR. RYAN:  Crooker dealt with a device that
19   was not, that was not in any way shown, and the
20   government never even tried to show, it put nothing in
21   Crooker, for example.  The government never tried to
22   show intent at all.  What Crooker said was, hey, that
23   intent is important, but it never got to whose intent
24   we're talking about when, for example, in this case it's
25   a commercially developed silencer.
```

```
 1              THE COURT:  To the extent that Crooker is read
 2    to say that subjective intent is required, because
 3    that's how I construe Crooker, and that's how every
 4    judge in the First Circuit construes Crooker when they
 5    give an instruction in a 921 case, which we do all the
 6    time, you're saying that's wrong.  We have to change our
 7    instructions now.  We now have to instruct every jury in
 8    the United States with a 921 case, has to be instructed
 9    that you need not prove, the government need not prove
10    that this defendant, this felon in possession of a
11    firearm, allegedly, intended that this device be used as
12    a, subjectively intended that this device be used as a
13    silencer, it is sufficient if he objectively intended
14    it.  From now on, contrary to all the criminal jury
15    instructions everywhere in the United States, we now all
16    have to go with what you're saying, and criminal
17    defendants no longer can get out of an indictment for
18    being a felon in possession of a firearm by arguing the
19    defense whatever, whatever he says was objectively
20    intended, I didn't intend it.  And that's the law in the
21    First Circuit.  That's the law in every circuit.  You're
22    saying we can't follow that law anymore.
23              MR. RYAN:  No, sir --
24              THE COURT:  How do I follow that law and adopt
25    your interpretation?
```

39

98

```
1   infer somebody's intent.  If that's all you were saying,
2   that's not objective intent.  That is circumstantial
3   evidence establishes subjective intent.  You're saying
4   something different, which is objective intent.  And
5   that's not the evidence can persuade you that somebody
6   subjectively intended.
7            So how can I give an instruction that you must
8   prove that somebody subjectively intended if the ATF
9   response in the Sig Sauer case is now the binding law
10  across the United States in all criminal cases enforcing
11  921 violations, how do I do that?
12           MR. RYAN:  I'm not sure how to answer the
13  question, sir.
14           THE COURT:  Yeah, it's a problem for you,
15  that's why, it's tough.
16           MR. RYAN:  And I understand, I do understand
17  the argument.  The problem is, is that there are other
18  cases, for example, that we cited, that talk about, for
19  example, the Focht case which was a fireworks case, and
20  the Poster 'N' Things case from the Supreme Court that
21  talked about yet although somebody can say these things,
22  you look at what the use is in the community.  ATF knows
23  that from going about and looking at all of these
24  things.
25           THE COURT:  Yeah, but right now the government
```

1  can't put somebody in jail for being a felon in

2  possession of a silencer unless they prove beyond a

3  reasonable doubt that that, if they have a, that what

4  they have is intended for use as a silencer, okay.

5  Everybody else in the world but this guy would see that

6  this is a silencer is not enough.  That evidence might

7  persuade you that he actually intended it, but the

8  elements of the claim is he had to subjectively intend

9  it.

10          Now, I understand you to be explaining that is

11  not correct.  Every court and every judge across the

12  country in criminal cases has been misinterpreting what

13  intended means.  We know what it means, and it means

14  objectively intended.  That's what you're saying, isn't

15  it?

16          MR. RYAN:  Well, I -- perhaps what it is,

17  then, your Honor, is an inartful use of objective.

18  Objective from the perspective of ATF, because they

19  don't necessarily have a trial where they put everything

20  out, they get the submission from the individual, then

21  have to look at the known universe of items and what

22  these items are, and figure out what the actual intent

23  is.

24          THE COURT:  Do you have any cases where the

25  objective intent standard that you're using is explained

1          MR. RYAN:  Yes, yes, sir, I believe it is.

2          THE COURT:  So, your position is an objective

3    intent is what the word intended should mean; right?

4          MR. RYAN:  Yes, sir.

5          THE COURT:  Crooker would not permit a person

6    to be convicted without proof that they subjectively

7    intended.  I don't know, Mr. Plourde hasn't done this

8    kind of work but his colleague in the back of the room

9    has done it for many, many years, if she disagrees with

10   me, she should go up and tell Mr. Plourde, and she's now

11   shaking her head no, because she knows subjective intent

12   is an essential element of one of these violations.  The

13   theory that you are propounding will change the

14   instruction that has to be given in every criminal case

15   in the United States under 921(c) where there is a felon

16   in possession of a firearm charge.  That's the effect of

17   your letter to Sturm Ruger if what you're saying is

18   correct.  Now, just explain to me why that shouldn't be

19   the effect.

20          MR. RYAN:  And as I said before, sir, it may

21   simply be that what we're looking at are the objective

22   features in making this classification.  That

23   objectively, when you look at these things, you know,

24   and I understand your point on that, but you know that

25   based on this, this is what the thing must be.  And so

 1  sell it around the world.  I'm not going to do that.

 2  That would -- that is a -- something that requires very

 3  careful consideration of evidence.

 4          MR. HALBROOK:  Your Honor, if you do remand

 5  the case, we would ask if you would set the deadline for

 6  them to report back because, as I say, the Innovator

 7  case is still hanging there after well over a year.

 8  This case has been going on a significant period of time

 9  and we'd appreciate it if there would be some deadline

10  for reporting back to the Court if you do remand.

11          THE COURT:  All right.  Thank you.  Anything

12  you want to say in addition to what you've already said

13  here?

14          MR. RYAN:  No, your Honor.

15          THE COURT:  So I'm going to continue to think

16  about this, but I think it should be obvious to you

17  guys.  I spent a lot of time reading and thinking about

18  this case, so I'm going to work on it hard, I'm going to

19  get a decision out before the end of August, and I do

20  have, I want to be clear, I have some significant

21  concerns that the ATF, although well intentioned, has

22  not correctly interpreted the statute.  I'm concerned

23  that the ATF, the ATF's contrary interpretation is not

24  entitled to Chevron deference, and that the deference

25  that it is entitled to does not warrant the adoption of

1    the ATF's interpretation.

2              I am also concerned that the ATF has not

3    correctly applied Section 3 to the evidence in the case

4    here and that therefore it acted arbitrarily in failing

5    to sufficiently comment upon and assess the argument

6    that the -- that Sig Sauer made under Section 3.

7              I have those concerns.  To the extent that

8    they turn out to be meritorious concerns and I determine

9    that the ATF decision cannot stand, my strong preference

10   would be and current intention would be to remand the

11   matter so that the ATF could consider the issue under a

12   correct standard, and my inclination would be to meet

13   with the parties after issuing the order, determine

14   whether somebody is going to take an appeal so we can

15   get this thing moving, and talk to you about what kind

16   of process we could agree on to get a relatively

17   expeditious redetermination of the issue by the ATF.

18             So, if the decision comes out the way I'm

19   currently thinking it should come out, you need to be

20   thinking about how you will both respond when I call you

21   on the phone and say what do you want to do from here.

22   Okay?

23             MR. HALBROOK:  Yes, your Honor.

24             THE COURT:  Anything else?  All right, thank

25   you.  I appreciate your argument and your briefing.